[Civ. No. 46801. First Dist., Div. Two. Nov. 17, 1980.]

HELEN A. ALHINO, Individually and as Executrix, etc.,
Plaintiff and Appellant, v.
MARVIN D. STARR et al., Defendants and Respondents.

HELEN A. ALHINO, Individually and as Executrix, etc.,
Plaintiff and Appellant, v.
MASON-McDUFFIE COMPANY et al., Defendants and Appellants.

162

**COUNSEL**

Harry Gonick and Brian McCarthy for Plaintiff and Appellant.

Cresswell, Terreo, Davis & Lamborn, David Terreo, Ronald D. Echeguren, Wendel, Lawlor, Rosen & Black, Eugene K. Lawlor, Richard G. Logan and Bruce A. Lieberman for Defendants and Respondents and for Defendants and Appellants.

**OPINION**

**TAYLOR, P. J.**—In these two matters consolidated for trial, Mason-McDuffie Co. and Senjo (collectively, real estate defendants), appeal from that part of a judgment entered on a jury verdict in favor of Alhino[1] for general damages of $145,905 and punitive damages of $150,000, in the 1976 action against them for fraudulent misrepresentation as to the security and assets of Ranker, the insolvent buyer of a parcel of real property from Alhino in 1972; Alhino cross-appeals from the conditional order granting the real estate defendants a new trial on grounds of excessive damages. Alhino also appeals from the part of the judgment entered on the verdict in favor of Starr et al. (collectively, attorney defendants),[2] in a 1976 malpractice action against them for the settlement and dismissal of the 1974 Alhino action against Ranker. The major issues on appeal are: 1) whether Alhino's action against the real estate defendants was barred by waiver or collateral estoppel, as the re-

---

[1]Mrs. Alhino's appearances are individually and as executrix of the will of her husband, collectively Alhino.

[2]Alhino subsequently dismissed her appeal as to one of the attorney defendants, B. M. Gallagher.

sult of the settlement and dismissal of the 1974 action against Ranker; 2) the sufficiency of the evidence as to each of the defendants; 3) the propriety of the court's instruction directing a verdict in favor of the attorney defendants if the real estate defendants were found liable; and 4) the validity of the conditional new trial order, which contained no written specification of reasons, as required by Code of Civil Procedure section 657. For the reasons set forth below, we have concluded that: 1) the void conditional new trial order must be reversed; 2) the judgment on the verdict in favor of Alhino, et al. must be reinstated and affirmed, but remanded for a redetermination of the amount of punitive damages; and 3) the judgment on the verdict in favor of the attorney defendants must also be affirmed.

Viewing the record most strongly in favor of the judgment and verdict, as we must, the following pertinent facts appear: Alhino owned two parcels of contiguous improved real property in Oakland, comprised of an apartment and commercial units. In 1971, Mason-McDuffie and its employee, Robert Senjo, in cooperation with another salesman from Mason-McDuffie, had been the real estate agents in an attempt by Alhino to sell that building. No sale took place at that time and the property was taken off the market because of Mrs. Alhino's health.

Subsequently, Senjo learned from another Mason-McDuffie salesman that the property was for sale again. Senjo contacted Alhino by telephone to verify the pertinent financial information, including rents and expenses. They discussed the price ($189,000)[3] and other terms of sale, including Alhino's willingness to carry back a loan after a $35,000 downpayment.

About a month later, Senjo contacted Dr. Ranker, an Oakland ophthalmologist, to whom he had sold other properties. After Senjo showed Ranker the Alhino property, Ranker informed Senjo that he would buy the property if Alhino agreed to carry back the loan on an unsecured promissory note. Ranker told Senjo that he wanted to acquire the Alhino property without encumbrances as: 1) he wanted to trade it for a larger parcel; and 2) he wanted to be good and late on the payments without taking a risk.

Senjo prepared a deposit receipt for the sale of the property to Ranker and presented it to Alhino who signed it after a brief discussion and

---

[3]This figure included Senjo's commission of $10,000.

two minor changes. The deposit receipt stated that the Alhinos had employed Senjo and agreed to pay the $10,000 commission. Alhino believed that Senjo was their agent. When Senjo presented the deposit receipt to Alhino, he told them that Ranker was a very wealthy man and they were better off taking an unsecured promissory note from Ranker. He indicated that with an unsecured note, they would get money in case of a default while with a secured note they would only get the property which might then be in bad shape. He also submitted Ranker's financial statement, which indicated that Ranker owned real properties with a net worth in excess of $5 million. Senjo also told Alhino that he had personal knowledge of some of the real estate holdings listed on Ranker's financial statement. Senjo then obtained Ranker's approval.

Senjo prepared the promissory note for $154,000, the balance of the purchase price, payable at the rate of $1,200 per month, including interest of 7 percent per annum. The note contained neither of the customary clauses for attorney fees and acceleration. Senjo had intentionally omitted these clauses at Ranker's direction. Alhino did not know about the omission of these customary clauses or their legal effect.

Prior to the close of escrow, Ranker informed Senjo that he wanted to borrow the amount of the commission ($10,000) from Mason-McDuffie. Senjo submitted this request to his supervisor, who approved it. Ranker then signed a promissory note in favor of Mason-McDuffie for $10,000. Ranker also told Senjo he wanted to borrow the remaining $25,000 of the downpayment. Senjo introduced Ranker to a loan officer at Wells Fargo Bank, where Mason-McDuffie was a "well known account." Wells Fargo loaned Ranker the sum of $25,000 that he needed to complete the downpayment.[4] Senjo did not inform Alhino of either of these loans.

The evening before the close of escrow, Senjo brought the closing papers to Alhino's home for signature. In a conversation which included Alhino's son, Senjo expounded on Ranker's wealth. Senjo stated that Ranker's financial statement conclusively demonstrated Ranker's ability to pay and that Ranker's fortune was based on possession of assets that were not listed in the financial statement, such as gold certificates.

---

[4]Ranker defaulted on his obligation to repay this loan in 90 days. He subsequently paid it under pressure and was refused another loan on the basis of a financial statement purporting to show his assets as of June 1972.

Senjo also reiterated that he had personally sold some of the properties on the list to Ranker.

Escrow closed in July of 1972. Thirty days later, Ranker mortgaged the property for $98,500. After the first few months Ranker developed a pattern of late monthly payments. Alhino, on May 1, 1973, consulted a lawyer, Marvin B. Starr, a partner in the firm of Miller, Starr & Regalia. Starr reviewed the papers and was startled when he discovered that the note failed to contain the usual attorney fees and acceleration clauses. Alhino was shocked and surprised also.

Starr called in Barry Gallagher, an attorney employed by his firm, who had handled several cases in which Ranker was a defendant, for Dr. Marshall, another client of the firm. On May 21, 1973, Starr drafted and sent a letter to Ranker, to Senjo and to Mason-McDuffie. By the time of this letter, Senjo was no longer employed by Mason-McDuffie. Starr accused all three of fraudulent and negligent conduct in connection with the sale of the Alhino property and demanded a meeting that never took place. Instead, Starr heard from Ranker's attorney, William Kenney, who said he would advise Ranker to revise the note to include the missing attorney fees and acceleration provisions.

Shortly thereafter, Starr talked to Lee Kaufthiel (a partner in Mason-McDuffie and also its counsel) and informed him that Senjo had provided the original promissory note without the attorney fees and acceleration clauses. Senjo had turned over the entire file to his supervisor, Mr. Valentine (another partner in Mason-McDuffie), and told Valentine everything he knew about the Alhino transaction.

By January of 1974, Ranker still had not provided the reformed promissory note, as promised. Accordingly, in January 1974, the attorney defendants, on behalf of Alhino, filed suit against Ranker and Does I-X in Alameda County Superior Court, action No. 444948-3 (hereafter referred to as the 1974 Alhino-Ranker action), alleging fraud and breach of oral contract by Ranker, who had induced Alhino to enter into an unsecured transaction and misrepresented his wealth. The complaint in the 1974 Alhino-Ranker action sought general and punitive damages for fraud, reformation of the note by including the missing clauses, declaratory relief and quiet title; a first amended complaint filed February 6, 1974, added a cause of action for rescission.

In March, the 1974 Alhino-Ranker action was dismissed with prejudice in exchange for a reformed promissory note including the two missing clauses. At the same time, Alhino deeded to Ranker a portion of the Fruitvale property (Harold Street), which had been inadvertently left out of the original transaction by the title company. In May 1974, Ranker sold the property.

Ranker continued to be late with his payments. In July 1974, Gallagher prepared another action against Ranker on behalf of Alhino. However, Gallagher became convinced this action was ill-advised and it was never filed.

On August 8, 1974, Mr. Alhino died suddenly of a heart attack. After his death, Ranker made no more payments on the note. By December 1974, Ranker was several months behind on the payments. On December 11, 1974, Starr wrote a letter demanding that Ranker pay the past due installments and threatened legal action. On December 18, 1974, Ranker committed suicide. After Ranker's death, the attorney defendants filed a claim against Ranker's estate on behalf of Alhino for the amount of the outstanding balance on the note. The claim was approved in full by Ranker's estate. However, early in 1975, the attorney defendants were advised that Ranker's estate was insolvent and would be paying creditors approximately 25 cents on the dollar. After receiving this information, Alhino asked Starr for representation in an action against the real estate defendants. Starr indicated that Alhino would have to seek other counsel, as in July 1974, his firm had begun to represent Mason-McDuffie on a regular basis.

Alhino filed the instant actions against the real estate defendants in January 1976, alleging fraud and misrepresentation in the Ranker transaction, particularly as to the terms of the note and truthfulness of his financial statement. The answer of the real estate defendants alleged five affirmative defenses, as follows: 1) estoppel as a result of the 1974 action against Ranker; 2) Alhino's knowledge that the note was unsecured and subsequent receipt of the reformed note; 3) assumption of risk; 4) laches; and 5) unclean hands. In December 1976, Alhino filed the action against the attorney defendants for malpractice. Both actions were consolidated for trial and tried to a jury, which made a special finding that Senjo was Alhino's agent in the Ranker transaction and rendered a verdict: 1) in favor of Alhino on the fraud counts against the real estate defendants for general damages of $145,000 and punitive

damages of $150,000; and 2) in favor of the attorney defendants on the malpractice counts.

The court then conditionally granted the real estate defendants a new trial on the issue of damages unless Alhino agreed to: 1) a reduction of the punitive damages to $25,000; and 2) assignment of all interest in the Ranker estate to them on satisfaction of the judgment. These appeals and cross-appeals ensued. This court granted Senjo's motion for permission to file a separate brief on the issue of ratification and Alhino's motion to advance the appeal.

We turn first to the issues raised by the real estate defendants. They first contend that as a matter of law[5] Alhino's instant action against them was barred by waiver and collateral estoppel, as a result of the settlement and dismissal of the 1974 action against Ranker. The real estate defendants rely on the general rule that one who, after a discovery of a fraud that induced him to enter into a contract, subsequently enters into a new agreement or modification, waives his right to damages for fraud under the original transaction (*Schied* v. *Bodinson Mfg. Co.* (1947) 79 Cal.App.2d 134 [179 P.2d 380]).

The argument of the real estate defendants is predicated on the theory that the reformed note constituted a new agreement between Alhino and Ranker. The deposit receipt did not indicate whether the note was to contain the usual and customary acceleration and attorney fees clauses. Alhino adduced uncontroverted evidence that in this state, the omission of these clauses is so unusual that a note without them is unacceptable. Thus, the 1974 Alhino-Ranker action sought reformation to include the missing clauses to conform to the agreement of the parties. To do what one is already obliged to do is not a valid consideration (Civ. Code, § 1605; *Capitelli* v. *Sawamura* (1954) 123 Cal.App.2d 169, 174 [266 P.2d 939]). The reformed note bore the same date as the original and was not supported by additional consideration. The transfer of the Harold Street property to Ranker also was a part of the original transaction. Thus, the documents executed in 1974 merely conformed the transaction to the original agreement. With the substitution of the reformed note, the reformation count of the 1974 Alhino-Ranker action became moot. The dismissal of the remaining causes of action, including the fraud count, was gratuitous and without consideration.

---

[5]In this context, we need not consider Alhino's contention that waiver was not pled properly or that the real estate defendants are precluded from raising the issue on appeal by their subsequent withdrawal of a jury instruction.

Even assuming that there was a new agreement, there would be no automatic waiver of the fraud. Further, there can be no waiver in the absence of an intentional relinquishment of a known right (*Lawson* v. *Town & Country Shops, Inc.* (1958) 159 Cal.App.2d 196, 201 [323 P.2d 843]).

More importantly, a careful scrutiny of the pleadings and proof reveals that the fraud and misrepresentation allegations in Alhino's instant action against the real estate defendants were separate and independent torts from that alleged in the 1974 Alhino-Ranker action. Alhino's only fraud allegation in the 1974 complaint referred to Ranker's misrepresentation of his wealth. While that is one of the acts alleged also as to the real estate defendants in the instant action, the torts were different. The significant factor is the harm suffered; that the same facts are involved in both actions is not conclusive (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 954-955 [160 Cal.Rptr. 141, 603 P.2d 58]). At the time of the real estate defendants' motion for a nonsuit, Alhino had adduced substantial evidence that Senjo was their agent in the Ranker transaction.

The general principles of agency (Civ. Code, §§ 2228 and 2322) combine with the statutory duties created by the Real Estate Law (Bus. & Prof. Code, § 10176).[6] ▮ "'The law imposes on a real estate agent "the same obligation of undivided service and loyalty that it imposes on a trustee in favor of his beneficiary." [Citations.] This relationship not only imposes upon him the duty of acting in the highest good faith toward his principal but precludes the agent from obtaining any advantage over the principal in any transaction had by virtue of his agency. [Citation.]' (*Batson* v. *Strehlow* (1968) 68 Cal.2d 662, 674-675 [68 Cal.Rptr. 589, 411 P.2d 101].) A real estate licensee is 'charged with the duty of fullest disclosure of all material facts concerning the transaction that might affect the principal's decision. [Citations.]' [Citations.]" (*Wyatt* v. *Union Mortgage Co.* (1979) 24 Cal.3d 773, 782 [157 Cal.Rptr. 392, 598 P.2d 45].) ▮ Alhino's action against the

---

[6]So far as pertinent, the statute provides that the grounds for suspension or revocation of a real estate license include any of the following: "(a) Making any substantial misrepresentation.

"(b) Making any false promises of a character likely to influence, persuade or induce.

"(c) A continued and flagrant course of misrepresentation or making of false promises through real estate agents or salesmen.

"(d) Acting for more than one party in a transaction without the knowledge or consent of all parties thereto."

real estate defendants was based on breach of fiduciary duties, wrongs independent of, and separate from, those perpetrated by Ranker.

In addition, the instant complaint also alleged the fraudulent misrepresentation and concealment by the real estate defendants of other matters than Ranker's wealth, such as: the missing attorney fees and acceleration clauses; Ranker's insistence on the omission so that he could avoid making late payments without risk; Ranker's need to borrow the $35,000 downpayment and to make use of Mason-McDuffie's bank connection at Wells Fargo.

■ As to the collateral estoppel, the parties agree that one not a party to prior action must fulfill three requirements before claiming the benefit of the doctrine: 1) the issue decided in the prior adjudication must be identical with the one presented by the action in question; 2) a final judgment on the merits; and 3) the party against whom the doctrine is asserted must have been in privity with a party in the prior action (*Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807, 813 [122 P.2d 892]).

■ Here, the determinative issue is the first one. The real estate defendants argue that since both actions arose out of the same transaction, there is sufficient identity of issues, as the issues in the present action could have been raised in the 1974 Alhino-Ranker action. They rely on *Sutphin* v. *Speik* (1940) 15 Cal.2d 195, 202 [99 P.2d 652, 101 P.2d 497]; *Kronkright* v. *Gardner* (1973) 31 Cal.App.3d 214, 216 [107 Cal.Rptr. 270]; *Steiner* v. *Thomas* (1949) 94 Cal.App.2d 655, 660 [211 P.2d 321]; *Lippert* v. *Bailey* (1966) 241 Cal.App.2d 376, 381 [50 Cal.Rptr. 478]; *C. H. Duell* v. *Metro-Goldwyn-Mayer Corp.* (1932) 128 Cal.App. 376 [17 P.2d 781]). A careful reading of each of the above authorities reveals that none applied the rule of *Bernhard, supra,* 19 Cal.2d 807, to the action as to a dismissal with prejudice and as to an issue which might have been, but was not, raised.

The rule does not mean that issues not litigated and determined are binding in a subsequent proceeding on a new cause of action. ■ Rather, it means that once an issue is litigated and determined, it is binding in a subsequent action notwithstanding that a party may have omitted to raise a matter for or against it which, if asserted, might have produced a different outcome (*Price* v. *Sixth District Agricultural Assn.* (1927) 201 Cal. 502, 511 [258 P. 387]; *Carroll* v. *Puritan Leas-*

*ing Co.* (1978) 77 Cal.App.3d 481, 490 [143 Cal.Rptr. 772]; see also 4 Witkin, Cal. Procedure (2d ed.) Judgment, § 201, pp. 3339-3341).

As our Supreme Court pointed out in *Clark v. Lesher,* 46 Cal.2d 874, 880, the pleadings and proof in each case must be carefully scrutinized. We have already indicated above that here Alhino's action against the real estate defendants was predicated on the breach of their fiduciary duties. Thus, the liability of the real estate defendants does not depend upon Ranker's conduct. Alhino's action against them did not involve the "same subject matter between the parties" (cf. *Wouldbridge v. Burns* (1968) 265 Cal.App.2d 82, 85 [71 Cal.Rptr. 394]). Furthermore, the dismissal of the 1974 Alhino-Ranker action did not amount to a factual determination that Ranker was not guilty of the alleged fraud, but merely established that Ranker could not be subjected to a subsequent fraud action by Alhino.

■ We conclude, therefore, that the real estate defendants' motion for a nonsuit was properly denied as Alhino's action against the real estate defendants was not barred as a matter of law.

■ We turn next to the contentions of the real estate defendants that there was insufficient substantial evidence of fraud.

Alhino's case against the real estate defendants turned on the jury's determination of the factual issue as to whether Senjo was Alhino's agent or Ranker's agent in the transaction. The jury returned a special finding indicating that Senjo was Alhino's agent. The real estate defendants do not question the evidentiary support for this finding, but focus on Senjo's acts and Mason-McDuffie's ratification. We have already set forth above Senjo's fiduciary and statutory duties to Alhino.

As detailed in our summary of the facts, when Senjo presented the deposit receipt, he told Alhino that Ranker was wealthy and that Ranker's financial statement indicated that he owned real properties with a net worth of over $5 million. Senjo also indicated that he had personal knowledge of at least five[7] of the nine properties listed, as he had sold some of them to Ranker. Apart from the two Orange Street properties and his home, uncontroverted evidence established that in 1972, Ranker

---

[7]At trial, Senjo reduced the number to four after hearing contrary testimony from the former Mrs. Ranker.

did not own five of the properties on the list (711 Lighthouse, Pacific Grove; 30th Street, Oakland; Highway 1, Pescadero; Monterey Street, San Francisco; Monterey Block, San Francisco; and Central Avenue, Alameda). Senjo also represented that over half of the gross value of the real estate listed was in the convalescent hospitals. As to the one at 2910 McClure Street listed on the statement, Senjo knew, or should have known, that Ranker no longer owned this property, as Senjo had been involved in trading it for one of the Orange Street properties. Senjo had no knowledge about the other convalescent hospitals listed, but did not so inform Alhino. As to the 233 Orange Street property which Senjo had sold to Ranker, the gross value was overstated, since the mortgage was listed at $100,000 instead of $280,000.

Based on his representations of Ranker's wealth, Senjo encouraged Alhino to accept the unsecured note rather than a note secured by a first deed of trust, did not reveal the omission of the attorney fees and acceleration clauses, the unusual nature of this omission, or the reason for it, i.e., Ranker's insistence.

Prior to the close of escrow, Senjo reiterated his representations as to the financial statement and in addition stated that Ranker had plenty of other assets, including gold certificates. He also never disclosed that Ranker had to borrow the full downpayment of $35,000 and had to make use of Mason-McDuffie's bank connection with Wells Fargo to obtain this loan. Senjo found the latter rather strange and wondered about it. Senjo was aware of his duty to disclose this fact to his principal, but stated that he did not do so because he believed that he was Ranker's agent. Even if so, he was required to refrain from representing both without full disclosure to the principals (*Loughlin* v. *Idora Realty Co.* (1968) 259 Cal.App.2d 619 [66 Cal.Rptr. 747]). Senjo also admitted that Ranker's borrowing of the entire downpayment was a fact that a real estate agent is obligated to disclose to his principal.

Although 30 days after Ranker acquired title to the Alhino property he mortgaged it for $98,500, he nevertheless defaulted on his 90-day loan to Wells Fargo for the $35,000 downpayment. After Ranker finally paid off this loan under pressure from Wells Fargo, he was refused another loan following an investigation of a financial statement of his assets as of June 1972. Alhino also adduced uncontroverted evidence indicating that for several years before his death, Ranker had borrowed substantial amounts from several banks.

A year before his suicide, Ranker had made an unsuccessful attempt to take his own life. Before his suicide, he consulted a bankruptcy attorney and indicated that he never owned some of the property listed on his financial statement. Further, the disparity between Ranker's financial position as represented at the time of the transaction in June 1972 and his death, two and one-half years later, leads to a reasonable inference that he was not wealthy in June 1972.

As indicated above, Senjo knew that some of his representations concerning the financial statement were false. He also knew that Ranker wanted the omissions in the note so that he could default with impunity, but considered it merely "eccentric." As the amount of the mortgage on the Orange Street property (which Senjo had sold to Ranker) was greatly overstated in the financial statement, the jury could reasonably infer that Senjo knew or should have known this fact. The fact that the convalescent hospitals in four different cities were shown as subject to a single mortgage also would have led a reasonable person to some inquiry.

There can be no question that the acts detailed above constituted ample substantial evidence of Senjo's violation of his fiduciary duties. The real estate defendants concede that although conflicting, there was ample substantial evidence of Alhino's reliance. We, therefore, do not need to discuss the sufficiency of the evidence on this issue.

Mason-McDuffie argues that in any event, they did not ratify Senjo's unlawful conduct. The record, however, indicates that: 1) Senjo had informed his supervisor of the details of the Alhino-Ranker transaction, including the unsecured note and loan of the downpayment; 2) prior to trial, Senjo was apparently reemployed by Mason-McDuffie and defended at the trial by their attorney. The assertion of defense alone demonstrates ratification of the employee's conduct (*Hale v. Farmers Ins. Exch.* (1974) 42 Cal.App.3d 681, 698 [117 Cal.Rptr. 146], disapproved on other grounds in *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, fn. 5 at p. 822 [157 Cal.Rptr. 482, 598 P.2d 452]).

■ In any event, the determination as to whether an employee committed a tort during the course of his employment turns on whether or not: 1) the act performed was either required or "incident to his duties" (*Curcic v. Nelson Display Co.* (1937) 19 Cal.App.2d 46 [64 P.2d 1153]), or 2) the employee's misconduct could be reasonably foreseen

by the employer in any event (*Ingle* v. *Bay Cities Transit Co.* (1945) 72 Cal.App.2d 283 [164 P.2d 508]; see also 1 Witkin, Summary of Cal. Law (8th ed.) Agency and Employment, § 164, p. 762). The employer's liability under the doctrine of respondeat superior extends to malicious acts and other intentional torts of an employee committed within the scope of his employment (*Ruppe* v. *City of Los Angeles* (1921) 186 Cal. 400 [199 P. 496]; *Transcon. & W. Air* v. *Bank of America* (1941) 46 Cal.App.2d 708, 713 [116 P.2d 791]; *Coats* v. *Construction & Gen. Laborers Local No. 185* (1971) 15 Cal.App.3d 908, 913 [93 Cal.Rptr. 639]).

■ A principal or employer who is not at fault directly for a tortious conduct of his employee or agent in the commission of a fraud may become liable in any event (see generally, Rest. 2d Agency, § 256 et seq.). As Witkin notes, the cases do not always distinguish between the agency theories of actual or ostensible authority and the tort doctrine of respondeat superior (1 Witkin, Summary of Cal. Law (8th ed. 1973) § 177, p. 775). Witkin further states: "*Liability may also be based on imputed knowledge. Thus, where the principal actually or apparently authorizes representations about a matter related to the agent's duties, and the agent has knowledge of their falsity, this knowledge may be imputed to the principal, even though the agent is acting adversely.* (See Rest.2d, Agency § 256, Comment d, § 272 et seq.; supra, § 146; 3 Am.Jur.2d, Agency § 282; cf. *Pashley* v. *Pac. Elec. Ry. Co.* (1944) 25 C.2d 226, 236, 153 P.2d 325 [notice imputed to prevent running of statute of limitations].)" (§ 177, p. 775; italics partially added.)

"*If the principal places the agent in a position to defraud, and the third person relies upon his apparent authority to make the representations, the principal is liable even though the agent is acting for his own purposes.* (Rest.2d, Agency §§ 261, 262, and Appendix, Rep. Notes, pp. 420, 429.) *The theory is that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him. It is immaterial that the principal receives no benefits from the transaction.*" (§ 178, p. 776; italics partially added.)

■ It is readily apparent that all of Senjo's acts were either approved or subsequently ratified by Mason-McDuffie. The ratification supports the award of punitive damages (*Egan, supra,* 24 Cal.3d, p. 822; *Agarwal, supra,* 25 Cal.3d, pp. 950-951).

Thus, the judgment in favor of Alhino against the real estate defendants must be affirmed. We defer our discussion of a setoff as to the compensatory damages and whether the punitive damages are excessive as a matter of law, to the final portion of this opinion, which deals with Alhino's cross-appeal from the order for a new trial.

We turn next to Alhino's appeal from the judgment on the verdict in favor of the attorney defendants in her action for malpractice. The issues on this appeal are the propriety of the court's instruction directing a verdict in favor of the attorney defendants if the jury found that the real estate defendants were liable to Alhino, and the sufficiency of the evidence.

■ On appeal from a judgment entered on a directed verdict, we view the evidence as on an appeal from a nonsuit (*Estate of Lances* (1932) 216 Cal. 397, 400 [14 P.2d 768]; 4 Witkin, Cal. Procedure (2d ed.) Trial, § 353, p. 3153). The only question is whether Alhino adduced any substantial evidence to support a verdict that the attorney defendants deviated from the standard of care in advising Alhino about Ranker's financial position and in exploring alternative settlement opportunities.[8]

■ Independent tortfeasors who do not act in concert are not jointly liable even though their acts have united to produce one injury; each is responsible only for the part of the damage resulting from his own acts (*Summers v. Tice* (1948) 33 Cal.2d 80, 87 [199 P.2d 5 A.L.R.2d 91]). As the attorney defendants were later possible independent tortfeasors, Alhino's burden was to show that their negligence aggravated the original harm caused by the tortious conduct of the real estate defendants (Rest. 2d Torts, § 879, com. a).

■ As set forth in *Budd* v. *Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433], the elements of legal malpractice, like those of any other action for negligence, are: 1) the duty of the professional to use such skill, prudence and diligence as other members of his profession commonly possess and exercise; 2) a breach of that duty; 3) a proximate causal connection between the negligent conduct and the

---

[8]Alhino concedes that our affirmance of the judgment in favor of the real estate defendants moots their allegations of malpractice predicated on the failure to sue these defendants in the 1974 Alhino-Ranker action. Accordingly, we need not discuss the conflict of interest issue.

resulting injury; and 4) actual loss or damage resulting from the professional's negligence.

If the allegedly negligent conduct does not cause damage, it generates no cause of action in tort. The mere breach of a professional duty, causing only nominal damages, speculative harm or the threat of future harm—not yet realized—does not suffice to create a cause of action for negligence. Hence, until the client suffers appreciable harm as a consequence of his attorney's negligence, the client cannot establish a cause of action for malpractice.

Here, Alhino adduced no evidence of aggravated damages as a result of the conduct of the attorney defendants. As to Starr's representations concerning Ranker's financial position, the record indicates that he advised Alhino that Ranker was financially responsible on the basis of his inquiries and a Dun & Bradstreet report. He further advised Alhino that any definitive ascertainment of Ranker's financial condition required a more extensive and expensive investigation. Alhino declined. As to alternative security settlements, the record indicates that the attorney defendants explored a first or blanket deed of trust (which was not acceptable to Ranker), as well as a second deed of trust (which was not acceptable to Alhino). Expert testimony was required (*Estate of Beach* (1975) 15 Cal.3d 623, 635 [125 Cal.Rptr. 570, 542 P.2d 994]). Here, even Alhino's expert had no opinion as to whether the attorney defendants had been negligent or failed to meet the standard of care in settling the 1974 Alhino-Ranker action. The defense expert also testified that there had been no breach of the requisite standard of care.

It follows that the trial court's conditional directed verdict instruction was proper and that the judgment in favor of the attorney defendants also must be affirmed.

Finally, we turn to Alhino's cross-appeal from the conditional order granting the real estate defendants a new trial[9] on the issue of damages unless Alhino: 1) consented to a reduction of the punitive damages to $25,000; and 2) assigned to them her interest in the Ranker estate. The real estate defendants concede that the order is invalid because of the

---

[9]Contrary to the contention of the real estate defendants, the cross-appeal is proper (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, fn. 1 at p. 918 [148 Cal.Rptr. 389, 582 P.2d 980]; *Miller* v. *National American Life Ins. Co.* (1976) 54 Cal.App.3d 331, 341-345 [126 Cal.Rptr. 731]).

trial court's failure to provide the requisite written specification of reasons (Code Civ. Proc., § 657). Thus, the order must be reversed (*Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 63 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059]; *Zhadan* v. *Downtown L. A. Motors* (1977) 66 Cal.App.3d 481, 494 [136 Cal.Rptr. 132]).

The real estate defendants argue, however, that as a matter of equity, the compensatory damages should be reduced by an offset in the amount of Alhino's recovery from the Ranker estate. This argument overlooks the fact that at trial, the real estate defendants took the position that Alhino's damages were too speculative, objected to evidence of the amount creditors were likely to be paid from the estate, and raised the issue for the first time in their motion for a judgment notwithstanding the verdict. Nor has the amount of the setoff been pled or proved (*Seaboard Music Co.* v. *Germano* (1972) 24 Cal.App.3d 618, 622 [101 Cal.Rptr. 255]). Here, of course, the amount of any potential setoff is fatally uncertain (cf. *Benard* v. *Walkup* (1969) 272 Cal.App.2d 595, 606 [77 Cal.Rptr. 544]), as the record does not indicate that the Ranker estate will be able to pay anything.

Mason-McDuffie also erroneously attempts to rely on the rule against double recovery. As pointed out in *Merlo* v. *Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5, 20 [130 Cal.Rptr. 416], double recovery is expressly permitted by Civil Code section 3294 in some circumstances. In any event, to permit the setoff here would result in giving effect to a portion of the void order for a new trial.

We now turn to the contention of the real estate defendants that the punitive damages of $150,000 were excessive as a matter of law. Our Supreme Court recently summarized the applicable principles of appellate review in *Neal* v. *Farmers Ins. Exchange, supra*, 21 Cal.3d, 910. An appellate court may reverse such an award only when it appears excessive as a matter of law, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice. The court stated (p. 928): "In making the indicated assessment we are afforded guidance by certain established principles, all of which are grounded in the purpose and function of punitive damages. One factor is the particular nature of the defendant's acts in light of the whole record; clearly, different acts may be of varying degrees of reprehensibility, and the more reprehensible the act, the greater the appropriate punishment, assuming all other factors are equal. [Cita-

tions.] Another relevant yardstick is the amount of compensatory damages awarded; in general, even an act of considerable reprehensibility will not be seen to justify a proportionally high amount of punitive damages if the actual harm suffered thereby is small. [Citation.] Also to be considered is the wealth of the particular defendant; obviously, the function of deterrence...will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort. [Citations.] By the same token, of course, the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter." How much in punitive damages will suffice in a particular case is not susceptible of mathematical definition (*Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 790 [157 Cal.Rptr. 392, 598 P.2d 45]).

■ Since the purpose of punitive damages is to punish the defendant and make an example of him, the wealthier the wrongdoing defendant, the larger the award of exemplary damages need be in order to accomplish the statutory objective (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]), from which it "also follows that the poorer the wrongdoing defendant the smaller the award of punitive damages need be in order to accomplish the statutory objective" (*Merlo v. Standard Life & Acc. Ins. Co., supra,* 59 Cal.App.3d, at p. 18). Finally, due consideration must be given to the importance of the public policy embodied in the statutory provisions the violation of which was the basis of plaintiff's claim, and the magnitude of defendant's violation of such policy (*Wetherbee v. United Ins. Co. of America* (1971) 18 Cal.App.3d 266, 270-271 [95 Cal.Rptr. 678]; *Weisenburg v. Molina* (1976) 58 Cal. App.3d 478, 490 [129 Cal.Rptr. 813]).

The evidence in this case supported Alhino's charge of a serious violation of the policy provisions designed to protect consumers against the violation of fiduciary duties by real estate brokers and their salesmen (cf. *Wyatt v. Union Mortgage Co., supra,* 24 Cal.3d, pp. 782, 790-791). As our Supreme Court stated in *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 808 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513]: "Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society" (cf. *Zhadan v. Downtown L. A. Motors, supra,* 66 Cal.App.3d, pp. 496-497).

However, the record here provides no evidence of the net worth of the real estate defendants. Further, the instant award has not been approved by the trial court though, by reason of its failure to make an adequate statement of reasons, the order granting a new trial cannot stand. Nonetheless, we have no power to weigh the evidence and judge the credibility of witnesses.

The order granting a new trial, for the reasons above stated, is reversed and the judgment reinstated. Having reinstated the judgment, we must take action appropriate to assure that the punitive damage award is not excessive and is not the product of the jury's passion or prejudice. Accordingly, we remand for a redetermination of the appropriate amount of punitive damages in light of the principles stated above. The trial court may take additional evidence on the net worth of the real estate defendants, if necessary.

The conditional order granting the new trial is reversed. The judgment on the verdict in favor of Alhino against the real estate defendants is affirmed as to the compensatory damages, but remanded for a redetermination of the punitive damages in light of the net worth of the defendants. The judgment on the verdict in favor of the attorney defendants is affirmed; they are entitled to their costs on appeal. As between Alhino and the real estate defendants, each party shall bear its own costs on appeal and cross-appeal.

Miller, J., and Smith, J., concurred.

Petitions for a rehearing were denied December 17, 1980, and the petitions of plaintiff and appellant and defendants and appellants for a hearing by the Supreme Court were denied February 11, 1981.