[No. A102152. First Dist., Div. Five. Apr. 14, 2004.]

EVEILIA PLANCARTE, Plaintiff and Appellant, v.
GUARDSMARK, LLC., Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, the DISCUSSION parts entitled Standard of Review, Respondeat Superior Doctrine and Intentional Torts, Respondeat Superior Doctrine and Negligence, and Negligent Hiring and Supervision, are not certified for publication.

## COUNSEL

The Derby Law Firm and Steven L. Derby for Plaintiff and Appellant.

Low, Ball & Lynch, Dean M. Robinson and Guy W. Stilson for Defendant and Respondent.

## OPINION

**JONES, P. J.**—Plaintiff and appellant Eveilia Plancarte (Plancarte) appeals a summary judgment in favor of defendant and respondent Guardsmark, Inc. (Guardsmark) in her action for various tort causes of action based on the acts of Guardsmark employee Toufik Kadah (Kadah). She contends there are triable issues of fact concerning Guardsmark's knowledge of the foreseeability of Kadah's conduct and whether his conduct constituted negligence. She also contends the court abused its discretion in denying her motion for new trial.

## BACKGROUND

### Kadah's Employment by Guardsmark

Guardsmark is a security service company that contracts for the placement of private security guards. It first hired Kadah as a Guardsmark security guard in October 1997. Kadah left for personal reasons in December 1997 and was rehired in November 1998.

Guardsmark issued Kadah a "blazer uniform" to wear on the job. It consisted of a white shirt, necktie, navy blazer with a company patch, and gray slacks. Under the terms of his employment he was forbidden to carry a firearm or other weapon.

Until the incident that gave rise to this lawsuit, Guardsmark had not received any reports of inappropriate behavior by Kadah. It had only once removed him from an assignment after the corporate client complained his accent made him difficult to understand.

On March 9, 2000, Guardsmark assigned Kadah to an office building commonly known as 135 Commonwealth, the first day it was engaged to provide security services to the building.

### Plancarte Action

Plancarte is an immigrant from Mexico who speaks limited English and does not read or write in any language. In her second and operative complaint against Kadah and Guardsmark she alleged generally: She worked as a janitor at 135 Commonwealth. At approximately 8:45 p.m. on March 9, 2000, she was cleaning a men's bathroom in the building when Kadah, wearing a "law enforcement type uniform" with a badge sewn on the chest, approached her and placed himself between her and the bathroom's exit so she could not leave. He violently grabbed her left breast with one hand while squeezing her face with the other. She was trapped for approximately 10 minutes while he attempted to kiss her. When a woman knocked on the bathroom door, Kadah violently pushed Plancarte away into a wall. Plancarte escaped from the bathroom when the woman opened the door. Because her English is poor, Plancarte tried to tell the woman she had been sexually assaulted by using hand gestures. Kadah exited the bathroom and chased Plancarte through the building and down a stairway, where she fell.

Plancarte's complaint contained causes of action against Kadah only for assault, battery, false imprisonment, and intentional infliction of emotional distress based on these general allegations. It also contained a cause of action against Kadah only for negligence, alleging: (a) he knew or should have known she was cleaning the bathroom; (b) he "carelessly burst unannounced into the" bathroom and frightened her to such a degree she feared harm; (c) she fled the bathroom attempting to escape the danger she perceived from Kadah's abrupt and negligent behavior; (d) she sustained physical and emotional injuries as a result of his negligence.

Plancarte's complaint contained causes of action against Guardsmark titled "respondeat superior," negligent hiring, and negligent supervision. Her cause of action for respondeat superior alleged: a security company dresses its employees in law enforcement type uniforms to elicit the public's compliance to the authority they represent; a foreseeable consequence of security work in which an employee wears a law-enforcement-type uniform is that the employee will take advantage of his perceived authority to assault members

of the public; Kadah acted within the course and scope of his employment as a uniformed security guard for Guardsmark, making Guardsmark liable for all Kadah's acts and resulting damages alleged in the negligence, assault, battery and false imprisonment causes of action against Kadah.

Plancarte's causes of action for negligent hiring and supervision alleged: Guardsmark knew or should have know that Kadah was unfit to perform the duties for which he was employed and that employing him posed an undue risk to people like her because (a) Guardsmark's psychological testing of Kadah indicated he was deceptive and had engaged in deviant sexual behavior; (b) it did not sufficiently investigate his work experience; (c) it aided Kadah in cheating on the examinations necessary to qualify as a security guard; (d) it failed to supervise him adequately when it knew he was unqualified to act as a security guard.

### Motion for Summary Judgment

Guardsmark moved for summary judgment on the grounds the alleged assault was not related to Kadah's employment and there was no evidence of negligent hiring or supervision.

Plancarte opposed the motion on the grounds there were triable factual issues as to whether it was foreseeable that Kadah would misuse his apparent authority as a security guard to assault her. Plancarte declared in support of her opposition that when Kadah came into the bathroom, she considered leaving but she thought she could trust him and had to obey him because he was wearing a uniform. She also supported her opposition with the deposition testimony of Kadah's supervisor, Christine Graves, who testified that, in her experience, the public is socialized to associate a person wearing a uniform as having a position of authority or responsibility.

Plancarte also opposed the motion on the grounds there were triable factual issues as to whether some of Kadah's conduct was within the scope of his employment because, according to his version of their encounter in the bathroom, he acted negligently. She supported this opposition with the notes supervisor Graves took during her interview of Kadah after the incident and with the report of a private investigator Guardsmark hired to investigate the incident.

According to Graves's notes, Kadah scared Plancarte while she was cleaning the bathroom because he "burst" in "unexpectedly" to wash his hands. He told Plancarte not to worry. After washing his hands, he put his hand on her shoulder to calm her, telling her he was leaving. As he opened the bathroom door, a woman who worked in the building asked for assistance

with a key. He helped the other woman with her key, then returned to the bathroom to calm Plancarte further and saw her running down the hall.

The private investigator's report of his interview with Kadah essentially accords with Graves's notes.

Plancarte further opposed the motion on the grounds there were triable issues of fact regarding the negligent hiring and supervision causes of action in light of the evidence of Kadah's untrustworthiness. She supported her argument with evidence that Kadah does not speak English, contrary to a Guardsmark requirement; he initially claimed to be a United States citizen on his job application, but later, with Graves's assistance, corrected his status to resident alien; he has two Social Security numbers; his 1997 and 1998 job applications contained discrepancies in the information about his wife; he sought unemployment benefits in 1998 before returning to his Guardsmark job claiming he had been "laid off," although he left voluntarily; his psychological test was flagged for retesting; and his test answers suggested lawlessness and sexual deviancy.

The court entered judgment for Guardsmark after granting its motion.[1] Plancarte's motion for new trial based on newly discovered evidence was denied. This appeal followed.

## DISCUSSION[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### Motion for New Trial

Plancarte contends the trial court abused its discretion in denying her motion for new trial on the grounds of newly discovered evidence that would demonstrate that Guardsmark ratified Kadah's wrongful acts.

■ A trial court's broad discretion in ruling on a motion for new trial is accorded great deference on appeal. (*Sherman v. Kinetic Concepts, Inc.* (1998) 67 Cal.App.4th 1152, 1160 [79 Cal.Rptr.2d 641] (*Sherman*).) However, particularly when reviewing an order denying a new trial, the appellate court is required to review the entire record to determine independently whether the error on which the new trial motion is based is prejudicial. (*Id.* at pp. 1160, 1161.)

---

[1] The action continues against Kadah.

[*] See footnote, *ante*, page 640.

■ Code of Civil Procedure section 657, subdivision 4, authorizes the grant of a new trial when the moving party has discovered new, material evidence which it could not, with reasonable diligence, have discovered and produced at trial. The moving party must establish (1) the evidence is newly discovered; (2) he or she exercised reasonable diligence in discovering and producing it; and (3) it is material to the moving party's case. (*Sherman, supra,* 67 Cal.App.4th at p. 1161.)

Plancarte moved for new trial based on the newly discovered evidence that Guardsmark had paid for Kadah's defense in the instant case. She argued that in so doing Guardsmark ratified Kadah's conduct because it knew he had pled nolo contendere to a misdemeanor sexual battery by the time he answered Plancarte's civil complaint.[5]

In support of her motion, Plancarte's attorney, Steven Derby, declared: the trial court granted summary judgment for Guardsmark on December 9, 2002. On December 10 he propounded discovery on Kadah, who remained a defendant in the action, through Kadah's attorney, Marc Eisenhart.[6] On December 18 Eisenhart, by telephone, asked for an extension of time to respond. During the telephone conversation Eisenhart initially volunteered that he was withdrawing as Kadah's attorney because Guardsmark would no longer be paying his fees. Later in the conversation Derby specifically asked him if Guardsmark was paying him to defend Kadah in the civil action; he denied it was. Following this conversation Derby noticed Eisenhart's deposition because he was unsatisfied with Eisenhart's answer about fee payments.

Derby further declared that at his January 16, 2003 deposition Eisenhart produced a letter to him from Attorney Dean Robinson of Low, Ball & Lynch, the firm representing Guardsmark. The letter, dated June 5, 2001, confirmed that Robinson had "advised [Eisenhart by telephone that day] that Guardsmark has authorized your representation for Mr. Kadah. [¶] Pursuant to the payment agreement, you will submit your bills for services to our office. Our office will be responsible for payment of same, and we will receive reimbursement from Guardsmark. . . . [¶] I look forward to meeting with you to discuss our mutual defense of this claim." During his deposition Eisenhart acknowledged that since June 2001, he had submitted his bills for representing Kadah to Low, Ball & Lynch, and received payment from the firm. Eisenhart also stated at the deposition that he understood Guardsmark and Low, Ball & Lynch would continue to pay him for defending Kadah, the remaining defendant in Plancarte's civil action.

---

[5] On November 6, 2000, Kadah entered a plea of nolo contendere to Penal Code section 243.4, subdivision (d)(1), unwanted touching of intimate part of another person for purpose of sexual gratification (since renumbered to section 243.4, subdivision (e)(1)).

[6] Eisenhart also represented Kadah during the criminal proceedings.

Guardsmark opposed the motion on the grounds (1) Plancarte provided no evidence that the "newly discovered evidence" of ratification could not have been discovered before her August 2002 opposition to Guardsmark's motion for summary judgment, given the July 2001 filing of Kadah's answer; (2) she did not show that the newly discovered evidence was material, i.e., would likely change the result; and (3) the evidence in support of Plancarte's ratification conclusion—Eisenhart's deposition testimony and Robinson's June 5, 2001 letter—were inadmissible hearsay, but even if admissible, this evidence did not support a finding that Guardsmark ratified Kadah's alleged wrongful actions.

■ We conclude the court did not abuse its discretion in denying the motion for new trial. As Guardsmark correctly argues, Plancarte's proffered evidence that it ratified Kadah's wrongful acts is inadmissible hearsay. Plancarte's principal evidence of ratification was Robinson's letter to Eisenhart confirming their agreement that Eisenhart should submit his bills for defending Kadah in the civil action to Low, Ball & Lynch. This letter was an out-of-court statement offered to prove the truth of her assertion that there was an agreement, which provided circumstantial evidence Guardsmark ratified Kadah's acts. As such it falls within the definition of the hearsay rule (Evid. Code, § 1200), and Plancarte has not argued any exception.

In any case, Guardsmark's payment of Kadah's attorney fees does not logically constitute its ratification of his wrongful acts. Under the circumstances it reasonably implies a sound business decision following a risk/benefit analysis. Kadah's conviction by plea of nolo contendere to a misdemeanor could not be used against him as an admission in the civil suit based on that act. (Pen. Code, § 1016.) Thus, whether Kadah had committed acts that amounted to a civil assault had to be proved anew in Plancarte's civil action. If Kadah could show his acts were not tortious, no liability would attach to Guardsmark at all, under either the respondeat superior doctrine or for negligent hiring/supervision. It was therefore in Guardsmark's interest that he have adequate and reliable representation. If Kadah were not individually represented, there could be a greater likelihood of poor self-representation or default, making Guardsmark's defense of the case significantly more difficult. The fact that Guardsmark pursued and ultimately prevailed on an alternate defense theory—nonliability under respondeat superior for an employee's sexual assault—did not restrict it from having all available defenses well advocated.

■ Additionally, Labor Code section 2802 requires an employer to "indemnify his employee for all that the employee necessarily expends or loses in direct consequence of the discharge of his duties. . . ." This statute obligates the employer not only to pay any judgment entered against the employee for

conduct arising out of his employment but also to defend an employee sued by a third person for such conduct. (*Jacobus v. Krambo Corp.* (2000) 78 Cal.App.4th 1096, 1100 [93 Cal.Rptr.2d 425]; *Douglas v. Los Angeles Herald-Examiner* (1975) 50 Cal.App.3d 449, 461 [123 Cal.Rptr. 683].) Unlike an insurer, the employer is not mandated to defend the employee whenever there is a potential for liability. "However, if the employer elects to run a risk and refuses to defend, the employer must indemnify the employee for his attorney fees and costs in defending the underlying action if the employee was sued for acts within the scope of his employment. [Citation.]" (*Jacobus,* at p. 1100.)

■ Acts necessary for an employee's comfort and health while at work, even though personal and not direct acts of service to his employer, do not take the employee outside the scope of his employment. (*Jacobus, supra,* 78 Cal.App.4th at p. 1102.) Using the bathroom during a workshift is such a necessary act, and it is undisputed that Kadah was permitted to do so during his shift. Plancarte's action against Kadah was based on conduct that occurred while he was engaged in such a permitted necessary act. Although the nature of Kadah's conduct against her, as alleged in her complaint, would place it outside the scope of his employment, there was no certainty that Plancarte would succeed in proving her allegations. She could not use Kadah's criminal conviction against him as an admission of wrongful acts, and Guardsmark's own investigation by both Graves, Kadah's supervisor, and its private investigator concluded that Kadah had not behaved as she claimed. Given the reasonable possibility that a jury could find that Kadah's conduct toward Plancarte while performing acts for his personal comfort during the course of his employment was not tortious, Guardsmark could understandably elect to provide him a defense rather than await the outcome of the trial. By paying for Kadah's attorney, Guardsmark would not only satisfy a statutory duty, it would, potentially, decrease the risk of the financial exposure it could face if Kadah could not present a competent defense for lack of counsel.

Plancarte relies principally on *Hale v. Farmers Ins. Exch.* (1974) 42 Cal.App.3d 681 [117 Cal.Rptr. 146] (*Hale*) to support her ratification argument. In *Hale* an insurance company and two local employees were sued for bad faith refusal to pay benefits under an automobile policy. (*Id.* at p. 686.) The jury awarded punitive damages against the insurance company. (*Ibid.*) The trial court granted the company's motion for new trial on the grounds there was insufficient evidence it authorized or ratified the wrongful acts of the individual defendants. (*Id.* at p. 694, fn. 1.)

In affirming the order for new trial, *Hale* first recited what it identified as a "proper statement of law," quoting *Ralphs v. Hensler* (1893) 97 Cal. 296, 303 [32 P. 243]: " 'Where an agent is authorized to do an act, and he transcends

his authority, it is the duty of the principal to repudiate the act as soon as he is fully informed of what has been thus done in his name, . . . else he will be bound by the act as having ratified by implication.' " *Hale* concluded that this "proper statement of the law must fail" under the circumstances of the case. As it observed, the trial court could reasonably infer there was no evidence that an officer of sufficient power to bind the company was fully informed of all material facts regarding the individual defendants' wrongful acts when the insurance company's unverified answer, denying their wrongful acts and asserting affirmative defenses, was filed. (*Hale, supra,* 42 Cal.App.3d at pp. 697–698.)

*Hale* also noted that "where a defense is maintained based upon the transaction as the agent was authorized to conduct it, [the] principal does not ratify the unauthorized transaction, although he knows the third person claims the transaction included . . . unauthorized acts." Because the insurance company withdrew its affirmative defenses after discovering the facts did not support them, and stood "merely" on a general denial that admitted only an agency relationship with the individual defendants and a valid insurance policy, "it cannot be said [the insurance company] was ratifying unauthorized acts." (*Hale, supra,* 42 Cal.App.3d at pp. 698–699.)

We decline to read *Hale* as standing for the rule that an employer who has been informed of the material facts regarding an employee's alleged tortious acts and still provides a defense for the employee has, ipso facto, ratified those acts and made itself potentially liable for them. First, *Hale's* source for a "proper statement of the law" regarding implied ratification absent repudiation, the 1893 *Ralphs v. Hensler* opinion, is questionable. *Ralphs v. Hensler* preceded the 1937 enactment of Labor Code section 2802, which obligates an employer to defend an employee sued for conduct arising out of his employment. Until the underlying action against the employee is resolved, the employer cannot be deemed " 'fully informed' " of what was done in the employer's name. (*Hale, supra,* 42 Cal.App.3d at p. 697, quoting *Ralphs v. Hensle, supra,* 97 Cal. 296.)

Second, *Hale* was proceeding from a different procedural posture. It had to determine whether the trial court had stated sufficient reasons for concluding there was insufficient evidence to support the jury's award of punitive damages and thus did not abuse its discretion in granting a new trial. The issue before us is whether the trial court abused its discretion in denying a new trial on the grounds of newly discovered evidence if the trial court could reasonably conclude that evidence was either inadmissible and/or not material, i.e., not probable to have changed the result. (Code Civ. Proc., § 657(4); *Sherman v. Kinetic Concepts, Inc., supra,* 67 Cal.App.4th at p. 1161.)

Plancarte also relies on *Alhino v. Starr* (1980) 112 Cal.App.3d 158 [169 Cal.Rptr. 136] (*Alhino*), in which a real estate brokerage and its individual employee were sued for fraudulent misrepresentation in a real estate transaction. (*Id.* at pp. 163, 167.) On appeal from a judgment in favor of the plaintiff, the brokerage argued there was insufficient evidence that it had ratified the unlawful conduct of its employee. (*Id.* at p. 173.) In affirming the judgment, *Alhino* made the bald statement, "The assertion of defense alone demonstrates ratification of the employee's conduct," citing *Hale* without discussion. As discussed above, we question that *Hale* can stand for such an absolute rule. In any case, the evidence in *Alhino* also demonstrated that the employee had fully informed his employer of his fraudulent acts and, after leaving the brokerage's employ,[7] was rehired before trial. (*Alhino, supra,* 112 Cal.App.3d at p. 173.)

Here, Kadah denied any wrongful acts to Guardsmark and, insofar as he pled nolo contendere, did not admit wrongful acts via a guilty plea. Guardsmark also suspended Kadah immediately after the incident and terminated him after the criminal conviction, evidence that militates against ratification of the acts he allegedly committed.

## DISPOSITION

The judgment is affirmed.

Stevens, J., and Simons, J., concurred.

On May 12, 2004, the opinion was modified to read as printed above.

---

[7] It is unclear in the opinion whether the employee left voluntarily or was dismissed.