[Civ. No. 22190. Fourth Dist., Div. One. Dec. 22, 1980.]

CATHLEEN SCHOMER, Plaintiff and Respondent, v.
DOUGLAS SMIDT, Defendant and Appellant.

**COUNSEL**

Sullivan, Jones & Archer, Charles D. Christopher, James P. Hill, Daniel R. Salas and William A. Smelko for Defendant and Appellant.

Donald C. Knutson, Stephen W. Parrish, Lynn & Walsh and Robert H. Lynn as Amici Curiae on behalf of Defendant and Appellant.

Thompson, Sullivan, McGrath & McDonald, Eric V. Benham, Donald McGrath II and Brian D. Monaghan for Plaintiff and Respondent.

Judith Di Gennaro as Amicus Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**KILGARIF, J.**\*—Cathleen Schomer filed a complaint on several grounds of intentional tort, including trespass, invasion of privacy, bat-

---

\*Assigned by the Chairperson of the Judicial Council.

tery, intentional infliction of emotional stress, and slander. The principal action was for slander. The jury returned verdicts for $20,000 general damages and $16,000 punitive damages. The thrust of Schomer's slander action was that Douglas Smidt uttered false and defamatory comments to her fellow employees which caused others to infer that Schomer was a lesbian. A codefendant, Conn Thrasher, upon motion at close of plaintiff's case, had judgment entered in his favor. The statute of limitations had barred action against him.

On April 29, 1976, appellant, respondent and other members of an airline flight crew No. 217 ended their workday with an overnight layover in Long Beach, California. They were to spend the night at the Edgewater Hotel in Long Beach where the incidents which precipitated the lawsuit occurred. Appellant asked respondent on several occasions during the day to socialize with him that evening. On each occasion, respondent declined and indicated she wished to spend the evening in her room. Smidt repeated his request in the limousine ride to the hotel and stated that in the past it was easier to "get some ass" and less of a problem "getting it on." Respondent was assigned a room with Heidi Spitz. They had dinner in the hotel restaurant and returned to their room to watch television. Smidt phoned the room several times. Schomer, believing it to be Smidt calling, did not answer. Smidt approached Schomer's room and knocked on the door. Schomer testified she heard the knock but did not answer and that Smidt hit the door until it burst open with a rush. Smidt entered the room. Smidt saw respondent reclining on one of the beds and Miss Spitz standing between the two beds. Smidt testified that, at no time, did he see anything to cause him to believe there was any lesbian activity. Smidt again requested respondent and Miss Spitz to leave the room and go downstairs to the bar. They refused. Smidt tried to physically pull Schomer off the bed stating he would carry Schomer down to the bar if she was tired. Schomer testified that Smidt was in the room for 20 to 25 minutes and as he was leaving the room he stated: "I know you Schomer. When I get through with you, your name will be mud. As far as the male crew members are concerned, you will be at the very bottom of the ladder." Smidt then returned to the bar and told Conn Thrasher and Leo Hansen that he walked in on Schomer and Spitz; that he had startled them; Spitz had her zipper down; that he was not sure what he had seen; that "they were getting it on" and "they were doing their own thing." Shortly thereafter, in the crew lounge at Burbank, California, Smidt had a conversation with flight attendant Beverly Johnson Gomes and stated that

he found them (Schomer and Spitz) in bed together and specifically, that he found Cathy going down on Heidi. On May 6, 1976, Mr. Thrasher told another flight attendant, Karen O'Connor: "You know we do have a few lesbians in the company. I know of an incident that took place and I got it from another crew member. And that was on an overnight, and one of our crew members was walking down the hall and the door was open and he happened to look in and saw two girls, one with her pants unzipped, on top of the bed, getting it on."

Schomer learned of the rumors concerning her from several flight attendants. The respondent called the chief pilot, Robert Carmichael. On May 18, 1976, a meeting was held in Mr. Carmichael's office to resolve the situation at that level, if possible. Schomer requested that Smidt apologize. Smidt made a response, "He saw what he saw and he did not feel he had to (apologize). He was a captain and didn't have to back off to anybody." Schomer stated "she would take it from there." Mr. Carmichael testified that when he asked Smidt if he had seen an explicit act, he said, "No, but I know what I saw," which caused Carmichael to assume that he felt there had been an illicit act. Schomer testified that 50 to 75 persons, including a flight passenger, discussed the incident with her and some of these persons referred specifically to lesbian acts.

Smidt takes issue with jury instructions on slander, trial court's refusal to grant a one-day continuance, and the amount of actual and punitive damages being contrary to the evidence and excessive as a matter of law.

All of plaintiff's causes of action were presented to the jury for decision. After argument, the court instructed the jury as follows: "The Plaintiff, in her complaint, claims she is entitled to damages from defendant Mr. Smidt, based on a number of different causes of action, each charging a wrongful act, causing her damage.

"The different wrongful acts charged are:

"Battery, trespass, invasion of privacy, intentional and unreasonable infliction of emotional distress and slander."

The court then defined the elements of each cause of action.

The court instructions on slander, pertinent to this appeal were: "Slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which: (4) Imputes to him impotence or a want of chastity;

"The person making the original communication is liable for each and every repetition of the defamatory matter, if such repetition was reasonably to be expected;

"If you find that the defendant stated, implied or gave the impression that plaintiff had engaged in lesbian sexual acts, then you are instructed as follows: Lesbianism is defined as female homosexuality.

"The charge of lesbianism implies unchastity and abnormal sexual behavior.

"If you find that the defendant stated, implied or gave the impression that plaintiff had engaged in lesbian sexual acts, then you are instructed as follows: The imputation of Lesbianism is slanderous per se. This means that such words are presumed by the law to cause damage and plaintiff may recover for her hurt feelings, mental suffering and humiliation without proving any out of pocket loss.

"If you find that plaintiff is entitled to recover from defendant on her cause of action based on slanderous utterance regarding Lesbianism or Lesbian activities you may infer that such communication was made with malice."

The court instructed on punitive damages, in part: "You may in your discretion award such additional damages, known as exemplary or punitive damages, if, but only if, you find by a preponderance of evidence that said defendant was guilty of oppression or actual malice."

 Smidt attacks the instructions on slander, contending that it was reversible error to instruct the jury that it could award "presumed" and punitive damages against Smidt without first a specific finding of "actual malice," and that further error was committed in instructing the jury that statements which impute lesbian activities constitute a want of chastity within the meaning of Civil Code section 46, subdivision 4.

■ Appellant cites *Gertz* v. *Robert Welsh, Inc.* (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997], as being applicable to nonmedia defendants. The *Gertz* case is clearly a "Freedom of Press" case, limited to the media, and not affecting or protecting nonmedia defendants. Throughout the case, references are to media publishers or broadcasters. Appellant has not demonstrated by any authority that "libel on its face" and "slander per se" requires proof of special damages. *Gertz*, speaking of damages, states on pages 349-350 [41 L.Ed.2d at page 811], "We need not define 'actual injury.'. . . [A]ctual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." Reading of Shiffrin, *Defamatory Non-Media Speech And First Amendment Methodology* (1978) 25 UCLA L.Rev. 915, characterizes the *Gertz* case properly as a "Free Press" case.

Schomer cites *Albertini* v. *Schaefer* (1979) 97 Cal.App.3d 822 [159 Cal.Rptr. 98], a 1979 case, which discussed slander per se and stated: "Words which fall within the purview of Civil Code section 46 are deemed to constitute *slander per se* [citations] with the effect that the utterance of such words is actionable without proof of special damage. [Citation.]" (Italics added.) (*Id.*, at p. 829.)

The policy considerations underlying the presumption of damages in slander per se cases are still valid today. In *Gertz*, the Supreme Court balanced these considerations against the need for a "vigorous and uninhibited press" and determined that the latter deserved the greater protection. (*Rowe* v. *Metz* (1978) 195 Colo. 424 [579 P.2d 83].)

We adopt the language of *Rowe* v. *Metz, supra*, and hold that the legal concept of slander per se has not been revised in California, except as to media defendants.

There was evidence of some special damages in the instant case. We find the instructions as to damages was proper and that slander per se is presumed to cause damage and plaintiff may recover for her hurt feelings, mental suffering and humiliation without proving any out-of-pocket loss.

■ We next turn to the instruction that: If the defendant falsely stated, implied or gave the impression that plaintiff had engaged in les-

bian sexual acts, that said imputation is slander per se and that the charge of lesbianism implies unchastity and abnormal sexual behavior.

The Legislature of this state has decreed that sexual conduct, of any sort, between consenting adults is legal. We are not concerned with legality but rather with chastity. To hold that *chastity* applies only to fornication borders on the ridiculous. *Kerr* v. *Kennedy* (1942) 1 K.B. 409, 411, 412, destroys this distinction. "Firstly, it is quite irrelevant that lesbianism is not a criminal offense either, but no one disputes that it is covered by the term 'unchastity'...'[w]hat imputations on a woman, qua woman, in the sphere of sexual morality, are grave enough to be actionable without proof of pecuniary loss'...can any distinction be drawn on this basis between adultery and fornication, on the one hand, and unnatural relations with other women, on the other, except that the imputation of the latter is, if anything, more wounding,...more likely to spoil the victim's prospects of marriage? No such distinction can...be drawn." To hold that chastity embraces only heterosexual intercourse would offend the majority of the public. Webster's Third International Dictionary, at page 379, defines "chaste" in 2(a) as "abstaining from all sexual relations." The term "unchastity" might have some relation with "pornography," wherein Justice Potter Stewart declared that he could not define pornography but stated, "I know it when I see it." (*Jacobellis* v. *Ohio* (1964) 378 U.S. 184, 197 [12 L.Ed.2d 793, 804, 84 S.Ct. 1676].) It would appear to this court, that despite the sexual revolution and the freedom of action and expression now extant, there is a distinction which must be drawn between proper, moral and legal conduct. Based on the new thinking a homosexual or heterosexual act could be proper, legal and questionably "moral." But everyone has a right to refrain from such activity and to enjoy an unsullied reputation of restraint. To state that one carries on sexual conduct be it alone, with members of the opposite or similar sex imputes to them a "want of chastity," which in the eyes and minds of their peers might and could subject them to disgrace, ridicule, damage to reputation, lacking virtue or reliability. We find that a false imputation of the commission of a homosexual act is slanderous per se.

■ The motion for continuance was made by Smidt who claimed surprise by the testimony of Beverly Johnson Gomes and sought to have the testimony of William M. Cecil, Assistant Director of Air Operations of the United States Treasury Department, who was to be flown in from Detroit, Michigan, under subpena. The court asked for an offer of proof and Smidt stated that testimony of Mr. Cecil would show that

witness Gomes was biased against Smidt because during a narcotics investigation, Smidt had furnished the name of Gomes, in addition to other flight attendants for investigation. Said offer of proof was considered by the court who ruled that the probative value of the testimony was outweighed by the prospect of undue prejudice and necessitated undue consumption of time. There was no assurance of the appearance of the proposed witness. Smidt had interviewed the witness Gomes sometime before the trial. All parties were advised of time constraints, agreed to move the matter expeditiously, and were aware the court had another matter trailing. The value of the testimony was questionable because opportunity was afforded Smidt on rebuttal to produce the same evidence and Smidt so testified.

We find the court exercised discretion in denying the motion for continuance.

■ Was the jury's award of compensatory and punitive damages excessive? Schomer testified to the injury to her reputation, her difficulty at work, the severe headaches, sleeplessness, nightmares and colds, all of which the jury could consider as warranting general damages in the amount of $20,000. The jury chose to believe that Schomer did sustain these injuries and damages. All presumptions are in favor of the award and a reviewing court must uphold an award of damages whenever possible. (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 61 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) We cannot say we find the award to be grossly disproportionate to the injury. The award of compensatory damages is affirmed.

■ Smidt contends that the punitive damages awarded were excessive in light of the gravity of his conduct and his net worth. The purposes of punitive damages are to punish the wrongdoer and prevent future misconduct. (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910 [148 Cal.Rptr. 389, 582 P.2d 980]; *Wetherbee* v. *United Ins. Co. of America* (1971) 18 Cal.App.3d 266 [95 Cal.Rptr. 678].) The jury had no trouble finding malice. The statements of appellant that "When I get through with you, your name will be mud," coupled with the allegations of lesbianism and the harm done were sufficient to justify an award. The net worth of appellant was considered. Smidt presented a two-year-old balance sheet indicating net worth of $160,000 with no adjustments made for the inflationary increase in value of real estate holdings and a salary in excess of $62,000 per annum. The award of $16,000 was not

shocking to the conscience and the learned trial judge considered this in his denial of the motions for new trial.

We are not privy upon which causes of action the jury based their verdict. Smidt makes no complaint about the causes of action for battery, trespass, invasion of privacy, unreasonable infliction of emotional distress and slander. Any or all of these could and probably did warrant an award of damages. Assuming, which we do not, that there was some error in the slander per se instructions, it would be harmless in view of the other causes of action in the case.

The judgment is affirmed.

Cologne, Acting P. J., and Staniforth, J., concurred.

A petition for a rehearing was denied January 7, 1981, and appellant's petition for a hearing by the Supreme Court was denied February 25, 1981.