[Civ. No. 6436. Fifth Dist. June 15, 1983.]

NELLIE VOSSLER, Plaintiff and Respondent, v.
RICHARDS MANUFACTURING COMPANY, INC.,
Defendant and Appellant.

954

## COUNSEL

Tuttle & Taylor, C. Stephen Howard, Jeffrey M. Hamerling and Alan D. Smith for Defendant and Appellant.

Richard R. Clifford and Arthur E. Schwimmer for Plaintiff and Respondent.

## OPINION

**ANDREEN, J.**—■■ ■■■ ■■ Defendant Richards Manufacturing Company, Inc. (Richards) appeals from a judgment following jury trial in a products liability case.[1] No attack is made on the sufficiency of evidence except as to the matter of punitive damages. The judgment was for compensatory damages of $25,000 and punitive damages of $500,000. We affirm.

### FACTS

We state the record in a light most favorable to the judgment. (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 922 [148 Cal.Rptr. 389, 582 P.2d 980].)

In the period from 1970 through 1972, Dr. Leonard Marmor, an orthopedic surgeon working with the defendant corporation, developed a prosthetic device known as the Marmor Modular Knee, which permitted treatment of certain diseases of the knee by inserting specially crafted pieces of metal and plastic onto the surfaces of the bones that make up the knee joint. The metal components of the modular knee were originally produced in three sizes—small, medium and large—and each size included three elements (a template, a trial and a final component), each perfectly matched within a size for implantation. When implanting a metal component, the surgeon used the template to mark and prepare the bone, the trial component to insure that preparation of the bone was accurate, and then cemented the final component permanently in place. An im-

---

[1]Richards also appealed from an order denying a motion for a directed verdict. This is not an appealable order. (Code Civ. Proc., § 904.1; 4 Cal.Jur.3d, Appellate Review, § 45, p. 83.)

portant part of the surgical technique involved placing the final component so that it did not protrude forward of its proper location and impinge upon the kneecap when the knee was flexed.

During 1973 defendant, through engineering error, began manufacturing final metal components of the medium category which were larger than originally designed and which therefore did not match the medium template and trial components. It was thus possible that a surgeon could prepare a bone for insertion of the medium metal component using properly sized medium template and trial components (which were reused from surgery to surgery) and then cement into place a too-large medium final component.

Defendant had no procedure for insuring that the final components it produced were of the proper size, and so it manufactured and sold the larger-than-proper medium final components for some time without discovering the error. In January of 1974, defendant discovered its error, but in order to prevent its competitors from gaining a larger share of the market for such devices, concealed it from the medical profession, from its own sales personnel and from Dr. Marmor. Defendant attempted to replace, on a pretext, all of the properly sized medium template and trial components with newly manufactured larger components, and later attempted to resell the originally designed medium components as a supposedly new "small-medium" size, all without informing anyone outside the defendant corporation of the reason for its actions.

On October 15, 1974, a Marmor Modular Knee was implanted in the right knee of the then 67-year-old plaintiff. One of the metal components used by the surgeon was a medium, and in the subsequent complications and treatment thereof it was revealed that the discrepancy between the older, smaller template and trial components and the larger final component had resulted in improper positioning of the final component, causing impingement on the plaintiff's kneecap which necessitated eventual removal of the kneecap, and other damages.

On the issue of punitive damages, plaintiff proved that the components of the modular knee were actually manufactured by a subsidiary of the defendant and "sold" to defendant for approximately $23 per component, of which 10 percent reflected profit to the subsidiary. Defendant sold the modular knee components to the medical profession for prices ranging during the relevant period from $108 to $140 per component. From January 10, 1973, through April 2, 1973, 4,042 of the medium trial and final components were manufactured. The modular knee components comprised about one-third of the output of the subsidiary that manufactured it. Defendant's sales revenues were approximately $50 million in 1979, and the modular knee was one of 7,000 different products sold by defendant during the relevant period. (Evidence regarding the number

of modular knee instrument sets [the template and trial components which were reused from surgery to surgery] in use and the number of implant surgeries performed using medium components was also introduced.)

Defendant sought to introduce testimony relating to the amount of royalties paid to Dr. Marmor in connection with the sales of the modular knee, and an objection on relevancy grounds was sustained. During cross-examination of Dr. Marmor following his rebuttal testimony defense counsel sought to examine him concerning his alleged bias against the defendant, but the trial court would not permit such questions.

During plaintiff's closing argument, defense counsel objected to the statement of plaintiff's counsel that defendant was ". . . doing over fifty million dollars a year in sales . . . ," on the grounds that it was unsupported by evidence, irrelevant and prejudicial. The objection was overruled on all grounds.

In the course of deliberations, the jury requested by note an interpretation of certain instructions relating to punitive damages. The court answered the jury's question as follows: "THE COURT: And what I want to tell you about this, is something that's rather simple, but I want you to listen to it carefully. And that is that there is no fixed relationship prescribed in the law between actual damages and punitive damages.

"That is a matter that's left to your sound discretion, but you should consider it in light of the whole instruction given, 14.71, pages one, and two, including the last two lines of page 29 that you asked me about.

"I can tell you nothing further."

### EVIDENTIARY RULINGS

Dr. Marmor testified at length in plaintiff's case-in-chief. Direct and cross-examination during plaintiff's case established that Dr. Marmor had demanded that Richards notify doctors about the change in the configuration of the medium component and indemnify him against any loss due to any malpractice action brought against him due to the mismatch, and that there was serious disagreement between Marmor and Richards as to what should be done to remedy the situation. In addition, there was testimony about litigation brought by Dr. Marmor against Richards because of the manufacturing error, and by way of attempted impeachment of Marmor, Richards read portions of the transcript of that litigation. It was further shown that Dr. Marmor and plaintiff's treating physician, Dr. Williams, were colleagues and had socialized, and that when Dr. Williams experienced problems in surgery with plaintiff's knee, he called Dr. Marmor. The same day that Dr. Williams phoned, Dr. Marmor

and his attorney traveled from Los Angeles to Tulare to meet with Dr. Williams in order to gather evidence for Marmor's case against Richards. It was established that Dr. Marmor had sought the testimony of other surgeons for use in his litigation against Richards. The jury also learned that Dr. Marmor would not permit Richards' salesmen to attend his seminars, and that he insisted that his name be removed from the product.

After the defense case, Dr. Marmor was recalled by plaintiff in rebuttal and examined concerning the nature of the fracture of plaintiff's femur following implantation of the modular knee, the size of the template and final components used in implantation, and the cause of certain damage to plaintiff's kneecap, all as revealed by previously introduced evidence. On cross-examination, after questioning relating to the rebuttal testimony, defense counsel proposed to question Dr. Marmor concerning his general bias against defendant. Following a nonreported conference at the bench, defense counsel announced the ruling of the court in a reported conference at the bench.[2]

■ It was well within the discretion of the trial court to preclude such cumulative and time-consuming duplication of inquiry. (*People* v. *La Macchia* (1953) 41 Cal.2d 738, 743-744 [264 P.2d 15]; *People* ex rel. *Dept. Pub. Wks.* v. *Miller* (1964) 231 Cal.App.2d 130, 134 [41 Cal.Rptr. 645]; *People* v. *Flores* (1977) 71 Cal.App.3d 559, 565-566 [139 Cal.Rptr. 546].) In a trial that had already consumed 13 court days and would last for another 5, no abuse of discretion appears from a limitation of cross-examination on a subject previously well covered by the defense.[3]

■ The second evidentiary error claimed by defendant relates to the exclusion of testimony which would have shown the amount of royalties paid by defendant to Dr. Marmor. After establishing that such royalties were paid, an objection to the question as to amount was sustained on the grounds that it was

[2]"[Defense counsel]: Your Honor, I will indicate that I have no further questions of Dr. Marmor at this time. I did have—did intend to go into some of the questions that were raised off the record in [*sic*] during the examination, such as general questions relating to bias of the witness, and you had indicated at that time that as far as rebuttal was concerned, you didn't think I had a right to go into that. I will state that that was a large part of what I intended to do from this point on, and I'd make an offer of proof that this witness is biased against Richards, and it colors his judgment, his medical judgment. And I intend to go into that. But based on the ruling off the record, I have no further questions regarding specifically to the testimony of this afternoon. And if I accurately stated your ruling, I have no further questions.

"THE COURT: You're accurately stating my ruling."

[3]The defendant's contention that the trial court failed to exercise its discretion because it believed that cross-examination for bias was not permitted as a matter of law is simply not supported by the record. To presume that a reasonable and legally proper ruling was founded upon an erroneous understanding of the law, as revealed only by the paraphrasing of the trial court's ruling by defense counsel, would be unnecessarily speculative.

irrelevant. Defendant's attempt to characterize this evidence as rehabilitative towards its expert, Dr. Bechtol, is disingenuous. It had already been shown that both Drs. Marmor and Bechtol received royalty payments from defendant. The notion that the jury would (or should) have compared the amounts paid to each expert (by the same party) in weighing their credibility is more a product of defendant's disappointment with the result of the trial than any reasoned analysis of its processes.

■ The trial court has very broad discretion in admitting or excluding evidence. (*Continental Dairy Equip. Co.* v. *Lawrence* (1971) 17 Cal.App.3d 378, 384 [94 Cal.Rptr. 887].) Both case law and constitutional authority provide that prejudice is not presumed and must be affirmatively shown. (*Ibid.*) A judgment will not be reversed unless it can be said that a different result would have occurred had asserted error not been made. (*Ibid.*) It is a tribute to the skill and diligence of the trial court that so lengthy and complex a trial produced such improbable assertions of error.

### Necessity of Introducing Evidence of Defendant's Wealth as Prerequisite for Punitive Damages

Citing *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, Richards contends that punitive damages may not be awarded unless a plaintiff introduces evidence of defendant's wealth or profit from wrongdoing. However, *Neal* holds only that in determining whether a punitive damages award was excessive as a matter of law, the court should consider the wealth of the defendant. *Neal* did not hold that a punitive damages claim would fall if plaintiff did not introduce evidence of defendant's wealth.

Defendant also relies on *Alhino* v. *Starr* (1980) 112 Cal.App.3d 158 [169 Cal.Rptr. 136], which reversed a conditional order for new trial on the grounds of excessive damages. The reversal was mandated by the trial court's failure to provide the requisite written specification of reasons. (Code Civ. Proc., § 657.) There was no evidence in the record of the net worth of the defendant. In order to assure that the punitive damages award was not excessive, the case was remanded for a redetermination of the appropriate amount. The appellate panel stated at page 179:

"However, the record here provides no evidence of the net worth of the . . . defendants. Further, the instant award has not been approved by the trial court though, by reason of its failure to make an adequate statement of reasons, the order granting a new trial cannot stand. . . .

". . . The trial court may take additional evidence on the net worth of the . . . defendants, if necessary.

". . . The judgment . . . against the . . . defendants is . . . remanded for a redetermination of the punitive damages in light of the net worth of the defendants." (*Alhino* v. *Starr, supra,* 112 Cal.App.3d at p. 179.)

The appellate panel's disposition is opaque. The judgment was reinstated, but the court took action ". . . to assure that the punitive damage award is not excessive . . . ." This language sounds as if the matter were remanded to the trial court for consideration of the new trial motion. Such action would imply that the verdict would stand, even though there was no evidence of net worth, but that the trial court should consider net worth on a new trial motion. However, in the same paragraph the court stated: "Accordingly, we remand for a redetermination of the appropriate amount of punitive damages in light of the principles stated above. The trial court may take additional evidence on the net worth of the . . . defendants, if necessary." (*Id.,* at p. 179.) This language suggests that the remand mandated a jury trial on the issue of punitive damages. We admit to some puzzlement as to the true holding in *Alhino*. *Alhino* was a decision of the First District, Division Two. Presiding Justice Taylor authored the opinion and it was concurred in by Justices Miller and Smith.

Justice Taylor also wrote *Nelson* v. *Gaunt* (1981) 125 Cal.App.3d 623 [178 Cal.Rptr. 167], in which Justices Miller and Smith concurred. It was a tort action for damages resulting from implantation of silicone in the breasts of plaintiff. Her special damages were $25,000. The verdict was for $450,000 in compensatory damages and $1.5 million in punitive damages. The court addressed the issue at page 643: "Equally without merit is Gaunt's contention that Civil Code section 3294 requires that an inquiry be made of his wealth before punitive damages can be awarded. The courts of this state have consistently held that in determining the amount necessary to impose the appropriate punitive effect, the court is *entitled* to consider the wealth of the defendant (*MacDonald* v. *Joslyn* (1969) 275 Cal.App.2d 282 . . .). The object is to make an example as well as a punishment to fit the offense and in determining the amount necessary to impose a punitive effect, the jury *may* consider the wealth of the defendant (*Roemer* v. *Retail Credit Co.* (1975) 44 Cal.App.3d 926 . . .). Thus, no review of a defendant's wealth is mandated before an award of punitive damages can be made."

In view of the fact that the identical justices served on the panels in the earlier case of *Alhino* and the later case of *Nelson* v. *Gaunt* and that the latter addressed the issue directly and unequivocally, it cannot be maintained that *Alhino* stands for the proposition that plaintiff is required to introduce evidence of defendant's wealth before an award of punitive damages can stand.

Richards also relies on *Forte* v. *Nolfi* (1972) 25 Cal.App.3d 656 [102 Cal.Rptr. 455]. There, a defendant who secured and caused to be recorded

what was in effect a forged instrument was assessed damages of $20,000. The maximum compensatory damages would have been $2,800. Against a claim that the damages were excessive, the plaintiff contended that the damages were justified as an award for punitive damages. The judgment was reversed with directions to reassess the compensatory and exemplary damages. The appellate panel concluded ". . . that the award made was the result of passion or prejudice engendered by a failure to properly determine the compensatory damages awardable, and to appraise the wealth of the wrongdoer." (*Id.*, at p. 689.)

Standing against *Forte* v. *Nolfi, supra,* is a considerable body of authority.

In *Zimmer* v. *Dykstra* (1974) 39 Cal.App.3d 422 [114 Cal.Rptr. 380], the Second District Court of Appeal upheld an award of $10 compensatory and $1,500 punitive damages to landowners whose access easement had been encroached upon. The Court of Appeal refused to follow *Forte* v. *Nolfi, supra,* 25 Cal.App.3d 656, and held that there was no necessity to introduce evidence of the wealth of a defendant to support an award of exemplary damages. (*Zimmer* v. *Dykstra, supra,* 39 Cal.App.3d, at pp. 438-439.)

*Zimmer* relied upon *Hanley* v. *Lund* (1963) 218 Cal.App.2d 633 [32 Cal. Rptr. 733], a Second Appellate District case which affirmed an award of $15,000 compensatory and $5,000 punitive damages in a slander action. The appellate court stated that it had discovered no authority requiring introduction of evidence of a defendant's wealth to support punitive damages, and further said: "The parties were content to go to the jury on the implied basis that defendant's ability to pay was consistent with his occupation. He did not contend, either in the trial court or here, that in fact the award made was excessive in the light of his financial status. *Since no authority, anywhere, expressly directs that the plaintiff must. introduce evidence of defendant's wealth when seeking exemplary damages,* we find no merit in defendant's contention in this regard." (*Id.*, at p. 646, italics added.)

*Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376 [89 Cal.Rptr. 78, 47 A.L.R.3d 286], in which an insurer was assessed $640,000 in punitive damages (reduced on remittitur to $180,000) based upon $60,000 in compensatory damages in connection with a claim of intentional infliction of emotional distress, also expressly held that there was no necessity that a plaintiff introduce evidence of a defendant's wealth in support of an award of punitive damages, citing *Hanley* v. *Lund, supra.* (*Id.*, at p. 404.) The opinion noted the Supreme Court's expressions of the desirability of such evidence, but ruled that it was not "absolutely essential." (*Ibid.*)

The trend of modern decisions in other jurisdictions is to place the burden of producing evidence of wealth on the wrongdoer, permitting the defendant to establish its financial inability to pay punitive damages.

For instance, in *Rinaldi* v. *Aaron* (Fla. 1975) 314 So.2d 762, the Supreme Court of Florida reversed a trial court's order removing consideration of punitive damages from the jury where the plaintiff had not introduced any evidence of the defendant's financial ability to pay. The court noted that such evidence of ability to pay was always admissible, but held that it was not a requisite to such an award, following the decisions of many other jurisdictions, including California.[4] (*Id.,* at p. 764.)

Similarly, in *Zarcone* v. *Perry* (2d Cir. 1978) 572 F.2d 52, the United States Court of Appeals for the Second Circuit rejected the claim of a defendant in a civil rights action that punitive damages awarded against him were improper because no evidence of his net worth was introduced at trial. The federal appeals court ruled that, ". . . decided cases and sound principle require that a defendant carry the burden of showing his modest means—facts peculiarly within his power—if he wants this considered in mitigation of damages. [Citations.]" (*Id.,* at p. 56.)

■ We recognize that since the purpose of punitive damages is to punish and deter wrongdoing by fashioning a monetary penalty tailored to the wealth of the defendant and to the reprehensibility of his conduct, absence of any evidence about the defendant's wealth significantly impairs a rational effectuation of this purpose. However, in view of direct California authority for the principle that the *plaintiff* need not introduce evidence of the defendant's wealth in order to be awarded punitive damages (*Nelson* v. *Gaunt, supra*; *Zimmer* v. *Dykstra, supra*; *Fletcher, supra*; *Hanley, supra*), it is consonant with stare decisis and consistent with the modern trend to require the wrongdoer to demonstrate at the trial level that a particular award of punitive damages will exact too great a penalty because of his financial condition. Presumably, in the great majority of cases it will be to the plaintiff's advantage to show that the defendant is capable of absorbing a substantial penalty, and in those situations where it is otherwise, the defendant will be motivated to show its penury. The defendant is in the best position to provide the most accurate data concerning its financial condition, and need not decide whether to introduce such information until after the plaintiff has presented a sufficient case for the punitive damages issue to go to the trier of fact. If the defendant wishes to challenge an award of exemplary damages on appeal, its production of financial data will provide the basis for appellate review as mandated by the Supreme Court in *Neal* and other cases.

Richards contends that ". . . to require a defendant to present 'mitigating' financial condition evidence would be, for all intents and purposes, requiring the defendant to make a tacit admission that some award of punitive damages is

---

[4]The Florida case cited *Fletcher* v. *Western National Ins. Co.,* *supra,* 10 Cal.App.3d 376 [89 Cal.Rptr. 78, 47 A.L.R.3d 286] as exemplary of California law. (*Rinaldi* v. *Aaron, supra,* 314 So.2d at p. 764.)

appropriate. . . . The unfairness of placing such a burden on the defendant is manifest." Although not directly analogous because such evidence almost invariably follows expert evidence produced by the plaintiff, we note that defendants in personal injury cases where liability is disputed regularly introduce evidence tending to show that plaintiff's injuries are less than claimed. Defendants have developed techniques which permit them to introduce mitigating evidence without diminishing the force of their contest as to liability.

For all these reasons, we hold that the plaintiff has no obligation to introduce evidence of the defendant's financial condition when seeking punitive damages.

### INSTRUCTIONS TO THE JURY

In the course of instructing the jury, the trial court stated as follows:

"The law provides no fixed standard as to the amount of such punitive damages, but leaves the amount to the jury's sound discretion, exercised without passion or prejudice.

"Any amount awarded for punitive damages should bear a reasonable relation to the actual damages, although no fixed ratio exists."[5]

The jury was provided with written copies of all instructions orally given by the trial court. In response to a note requesting interpretation of the instruction regarding the relationship of punitive and actual damages the court reinstructed the jury as set forth in the statement of facts, above. Defendant argues on appeal that the court's response to the jury request eliminated the requirement that punitive damages bear a reasonable relationship to compensatory damages because the trial court did not expressly repeat this admonition.

■ "It cannot be presumed on appeal that the jury ignored a proper instruction on damages. [Citation.]" (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 953 [160 Cal.Rptr. 141, 603 P.2d 58.) ■ In responding to the jury's request, the trial court specifically drew the jury's attention to the previously given instruction which expressly stated that punitive damages must bear a reasonable relationship to actual damages. The trial court's additional comment that there is no fixed relationship prescribed in the law between actual and punitive damages was a correct statement of the law. (*Nelson* v. *Gaunt, supra,* 125 Cal.App.3d at p. 644.) The trial court's response did not eliminate the requirement that punitive and compensatory damages be reasonably related, and therefore was not error.

---

[5]BAJI No. 14.71 (1980 rev.).

### DEFENDANT'S CONDUCT AS JUSTIFYING AN AWARD OF PUNITIVE DAMAGES

■ Defendant's attempt on appeal to suggest that its conduct exhibited a concern for the safety of the public via careful monitoring of its manufacture and sale of the modular knee is patently ludicrous. It was undisputed at trial that defendant purposely concealed the discrepancy in size between the medium final component as originally designed and as later produced by defendant from the medical profession, from Dr. Marmor—the inventor of the modular knee—and from its own sales personnel solely to protect its market position. The jury evidently disbelieved the self-serving testimony of defendant's corporate officers regarding their purported tests as to the medical significance of the larger-than-proper medium final component. Defendant further attempted to capitalize on its concealment of its manufacturing error by marketing the originally designed medium components as a purportedly "new" size. ■ The comments of the Court of Appeal in *Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757 [174 Cal.Rptr. 348] are particularly appropriate here: "In assessing the propriety of a punitive damage award, as in assessing the propriety of any other judicial ruling based upon factual determinations, the evidence must be viewed in the light most favorable to the judgment. [Citation.] Viewing the record thusly in the instant case, the conduct of Ford's management was reprehensible in the extreme. It exhibited a conscious and callous disregard of public safety in order to maximize corporate profits. Ford's self-evaluation of its conduct is based on a review of the evidence most favorable to it instead of on the basis of the evidence most favorable to the judgment. Unlike malicious conduct directed toward a single specific individual, Ford's tortious conduct endangered the lives of thousands of Pinto purchasers. Weighed against the factor of reprehensibility, the punitive damage award as reduced by the trial judge was not excessive." (*Id.*, at pp. 819-820.)

■ Defendant's conduct in the present case was marginally less monstrously inhumane than the conduct of the defendant in *Grimshaw,* since concealment of Richards' manufacturing error for the sole purpose of protecting its profits merely threatened excruciating pain and crippling immobility to thousands of arthritic patients and anguish to their physicians and their families, not the fiery death that the auto manufacturer visited upon its customers. However, insofar as reprehensibility of conduct was concerned, the jury's award of punitive damages was fully justified.

### PLAINTIFF'S CLOSING ARGUMENT

■ Richards contends that the court should not have permitted plaintiff's counsel to argue the amount of Richards' gross sales and a calculation of Richards' profit from its manufacture of the mismatched modular knee.

Counsel established the cost of the knee to Richards from its subsidiary and the sales price to its customers. From this he calculated an alleged profit margin and, using the number of operations of Dr. Jennings, constructed an argument of how much profit Richards had made from the sale of the mismatched knee.

The first question which must be addressed is whether Richards preserved the issue on appeal. There was an off-the-record conference which is the subject of a settled statement. The settled statement establishes that the sole defense objection was that there was no evidence in the record that the defendant was doing over $50 million a year in sales. And that, if supported by the evidence, such was irrelevant and prejudicial. This was the extent of the objection.

Net, not gross, figures are the best yardstick to be used in determining punitive damages. (*Little* v. *Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 469, fn. 5 [136 Cal.Rptr. 653].) Plaintiff's counsel purported to argue net income from the sales of the medium-sized components. Although the argument was superficial, there was no objection as to that portion of it. The issue is waived. (*Sabella* v. *Southern Pac. Co.* (1969) 70 Cal.2d 311, 318 [74 Cal. Rptr. 534, 449 P.2d 750].)

As to the objection as to the amount of gross sales, that figure was in evidence. Read in context, the gross sales amount was used in part to demonstrate to the jury that Richards was a sophisticated company and that when it made its marketing decision to conceal its product defect from its salesmen and the physicians who were to implant it, it should be held responsible for its actions. The gross sales figure was also used to bolster the amount of punitive damages claimed. However, there was no objection to this line of argument; the only objection made was to the use of the gross sales amount in the first context.

Evidence of gross sales figures are relevant, even if entitled to less weight than net profit. See, for example, *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910 which stated at page 929: "Finally, we note that the amount of punitive damages represented by the reduced judgment (i.e., approximately $740,000) represents less than one-tenth of 1 percent of defendant's *gross* assets . . . ." (Italics added.) And see *Wyatt* v. *Union Mortgage Co.* (1979) 24 Cal.3d 773 [157 Cal.Rptr. 392, 598 P.2d 45] which referred to the amount of late charge income of the defendants, without mention of what net income such charges generated.

Even in cases in which other evidence of net wealth appeared in the record, courts have indicated that figures on gross sales, gross income, or gross wealth are at least relevant to the issue of punitive damages. (See, e.g., *Pistorius* v. *Prudential Insurance Co.* (1981) 123 Cal.App.3d 541, 554-555 [176 Cal.Rptr. 660] [gross assets]; *Schomer* v. *Smidt* (1980) 113 Cal.App.3d 828, 836 [170

Cal.Rptr. 662] [affirming award of about 25 percent of the defendant's gross salary]; *Toole* v. *Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689, 700, 701 [60 Cal.Rptr. 398, 29 A.L.R.3d 988] [biggest drug in the defendant's history; gross sales]; *Armstrong* v. *Republic Rlty. Mtg. Corp.* (8th Cir. 1980) 631 F.2d 1344, 1353 [gross annual income]; *Sturm, Ruger & Co., Inc.* v. *Day* (Alaska 1979) 594 P.2d 38, 47, fn. 15 [gross wealth].)

We conclude that to the extent the issue was preserved for appeal, there was no prejudicial misconduct.

### RATIO BETWEEN PUNITIVE AND COMPENSATORY DAMAGES

 The jury's award of $500,000 in punitive damages represents a ratio of 20:1 between punitive and compensatory damages. Richards does not argue that such a ratio is disproportionate in punitive damage cases generally—indeed it cannot. It limits its argument to products liability actions, and contends that in the special circumstances of such litigation, the ratio is too high. It states that no punitive/compensatory ratio in a products case has ever exceeded 2:1 in California or 7:1 in any jurisdiction.

Products liability cases may be distinguished from typical punitive damage cases in several respects. The definition of proscribed conduct is malice, which may be established if the defendant acted with a "conscious disregard for the safety of others." A manufacturer designing a product must take trade-offs in terms of product safety against cost and utility. A design engineer necessarily makes cost-benefit analyses many times in the production of a complex product. Such a definition of malice may operate unfairly in some cases, and may tend to discourage product development. However, that consideration is of no moment here. Richards was not punished for a design decision; it had a well-designed product. Due to a manufacturing error, the product did not fit the template for which it was made. Richards knew of this defect, but in order to protect its competitive position against other manufacturers of prosthetic devices, decided to continue to market the defective product anyway. The public policy in favor of product development is unaffected by the award of punitive damages in this case.

Next it is argued that high ratios are improper in product cases because they run the risk of punishing the manufacturer several times for the same conduct. The argument is answered in *Grimshaw* v. *Ford Motor Co., supra,* 119 Cal.App.3d 757, 812: "We recognize the fact that multiplicity of awards may present a problem, but the mere possibility of a future award in a different case is not a ground for setting aside the award in this case . . . . If Ford should be confronted with the possibility of an award in another case for the same conduct, it may raise the issue in that case."

The suggestion in *Grimshaw* is similarly made in Restatement of Torts Second, section 908, comment e: "Another factor that may affect the amount of punitive damages is the existence of multiple claims by numerous persons affected by the wrongdoer's conduct. It seems appropriate to take into consideration both the punitive damages that have been awarded in prior suits and those that may be granted in the future, with greater weight being given to the prior awards."

We leave the problem to a court in which the problem is raised by proof of other litigation.

The requirement of a reasonable relationship between compensatory and punitive damages is a useful tool in guarding against juror excess. So applied in this case, the ratio of 20:1 is not too high. The actual damages were limited; Richards' conduct was egregious. A ratio of 20:1 would be excessive in a case like *Grimshaw*. It is appropriate here because the jury could logically determine that any less would not sufficiently punish and deter.

CONCLUSION

The judgment is affirmed.

Zenovich, Acting P. J., and Hamlin, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 7, 1983.