[No. F002243. Fifth Dist. Nov. 21, 1984.]

GEORGE GOSHGARIAN et al., Cross-complainants and Respondents, v. LEON Y. GEORGE et al., Cross-defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Parts I-C, II, IV, V, VI, VII, and VIII are not published as they do not meet the standards for publication contained in rule 976(b), California Rules of Court.

**COUNSEL**

Leon Y. George and Louise K. George, in pro. per., for Cross-defendants and Appellants.

McCormick, Barstow, Sheppard, Wayte & Carruth, Lowell T. Carruth and David H. Bent for Cross-complainants and Respondents.

**OPINION**

**ANDREEN, J.**—This is the third time that the parties, disputatious neighbors, have been before us.

The first time, we reversed the trial court because it granted a motion for summary judgment in an action by Leon George and his wife (herein cross-defendants) against George Goshgarian and others (collectively cross-complainants) for damages arising out of cross-complainants' denial of an asserted easement to run an electrical line to George's house across cross-complainants' property.

The parties were before us again on an appeal from the granting of another summary judgment. George had asserted several causes of action against various defendants, including some of the cross-complainants. In reference to causes of action for malicious prosecution and interference with economic benefit, we affirmed. But we reversed the grant of a summary judgment on the cause of action alleging property damage.

Our task today is to review a judgment in favor of cross-complainants, entered after jury trial, on a cross-complaint. We affirm as to the award of compensatory damages, but vacate and remand with directions in reference to the award of punitive damages.

## I. Facts

### A. *Cross-complainants' Case*

In 1977, cross-defendants purchased lot 62 in the Sierra Sky Park subdivision and began construction of a residence thereon, Mr. George acting as his own contractor. A dispute arose between cross-defendants and cross-complainants over whether cross-defendants would include an airplane port in the plans for their home, and antagonism developed between cross-complainant Joe Beighley and cross-defendant Leon George.

Prior to cross-defendants' purchase of lot 62, cross-complainants had become the owners of lot 115, a long, narrow parcel running along the northern boundaries of all the residential lots in the area in which the parties lived. The residential lots are on a bluff overlooking the San Joaquin River. Lot 115 is property steeply sloping down from the bluff toward the river. When cross-defendants attempted to obtain electrical power from an existing source on lot 115, cross-complainants refused to permit the power company to install powerlines over lot 115 to cross-defendants' home.

The first part of the residence constructed by cross-defendants was a swimming pool; cross-defendants filled the pool with water, but because no filtration system was in operation, the water became stagnant. Cross-defendants then began draining the water from the pool using hoses running over the bluff onto lot 115. Concerned that the draining water would erode the sandy soil of the bluff, cross-complainant Joe Beighley told cross-defendant Leon George that the latter could not drain his swimming pool water onto lot 115. Mr. George continued to drain his swimming pool water onto lot 115, asserting to Mr. Beighley that he (George) had a right to so drain the water, and claiming that he could do anything he wanted on lot 115 all the way to the bottom of the bluff. Cross-complainant Dr. Goshgarian told Mr. George that he (George) should ask the permission of cross-complainants before draining his pool water onto lot 115, to which Mr. George responded that he did not need cross-complainants' permission to drain his pool water. Although a sheriff's deputy visited the site of cross-defendants' home and instructed Mr. George not to drain the swimming pool water onto lot 115, Mr. George persisted in so draining, switching from garden hoses to PVC pipe when Mr. Beighley and cross-complainant Mike Mecca cut the hoses where they crossed onto lot 115. At some point during the time cross-defendants were draining their pool using hoses, they attempted to conceal the hoses where they crossed onto lot 115 by covering them with brush.

Sometime subsequent to the incidents relating to the draining of cross-defendants' swimming pool, Mr. Beighley observed that cross-defendants

were constructing a wall, a portion of which appeared to encroach upon lot 115. On August 28, 1978, Mr. Beighley had a conversation with Mr. George concerning this encroachment, but George "disregarded" the problem. Beighley sent a letter to George memorializing the conversation of August 28, 1978, but received no response. Beighley also had a conversation with George during this period in which he informed George that his (George's) pool decking and fence encroached upon lot 115, but George denied this asserted encroachment. During one conversation between Mike Mecca and Mr. George, at which Mecca pointed out the excavations made for George's wall extended beyond the property stake marking the boundary between lot 62 and lot 115, George pulled the property stake out of the ground and threw it away, saying "Property stakes don't mean nothing to me."

On April 14 and 18, 1980, a surveying firm hired by cross-complainants did a boundary survey of the line between lots 62 and 115. The surveying firm employee who actually took the measurements observed that some concrete footing supporting cross-defendants' pool decking extended .2 feet north of the lot 62 property line near the northeast corner of lot 62, with the encroachment continuing westward for approximately 14 to 15 feet reaching a maximum intrusion into lot 115 of .85 feet. He further observed that the pool decking itself encroached .48 feet north of the property line somewhat to the west of the concrete footing. Finally, the surveying firm employee observed that a wrought iron fence which ran along the pool decking encroached from .64 feet to 1.52 feet north of the lot 62/lot 115 property line (running from east to west and terminating just inside the western boundary of lot 62). A map was prepared under the supervision of Fred N. Rabe, a registered civil engineer and licensed land surveyor, which reflected the survey performed by his employees.

By letter dated April 18, 1980, Mr. Beighley informed cross-defendants of the results of the survey, and requested that the encroachments be removed, on pain of legal action. Mr. George replied by a letter dated April 20, 1980, in which he asserted that the survey done at the request of cross-complainants was erroneous, that his property line was actually two feet north of the location reflected in cross-complainants' survey, and stated that, if any encroachments were established to his satisfaction, he would compensate the owners of lot 115 based upon the area encroached and the market value of lot 115.

On June 14, 1980, Mr. Beighley had a conversation with Mr. George concerning some sod that George had placed on lot 115 and a sprinkler system he had installed to water that sod. Beighley advised George that the sprinkler system and sod were additional encroachments which would have

to be removed along with the pool decking and fence. George again laid claim to the entire bluff next to his home. Beighley stated that the owners of lot 115 would take legal action, and memorialized the entire conversation in a letter to George dated June 16, 1980.

At the time of trial, only the wrought iron fence had been removed by cross-defendants. The draining of cross-defendants' pool water caused erosion to the bluff on lot 115, and the encroachments clouded the title to the lot and made it unsalable. Three hundred and twenty one dollars and ten cents was paid to the surveyors. Jeanette Mecca testified that she suffered mental anguish as a result of Mr. George's actions.

### B. *Cross-defendants' Case*

After cross-defendants had purchased lot 62, but before construction of their residence had begun, cross-complainants met with Mr. George and demanded that he include an airplane port as part of his residence. George agreed to include a plane port only if cross-complainants, the Meccas and the Goshgarians, would add plane ports to their existing residences. Cross-complainants told Mr. George that if he did not add a plane port to the plans for his residence, they would not permit the power company to supply electricity to the George home. Cross-defendants were ultimately forced to dig a trench on the south approach to their lot so that power lines could be installed to their residence, with concomitant delays in the construction of that residence.

Mr. George denied ever being told by any cross-complainant that the pool decking, concrete footings, or wrought iron fence were encroaching on lot 115 until he received one letter, which prompted his reply letter of April 20, 1980. The subcontractor who installed cross-defendants' pool decking testified that during the three days he worked on lot 62, Mr. Mecca visited the site but never said anything about the decking encroaching upon lot 115. Mr. George began draining his pool because the cross-complainants complained to the district attorney's office about the lack of a fence and the stagnant water in the pool. George did not seek permission to drain water onto lot 115 because he felt he had the right to do so (lot 115 was burdened by an easement in favor of Fresno County for the storage and disposal of storm drain water), and because he was sure that such permission would have been denied. He began using PVC pipe to drain the water after cross-complainants had cut up the garden hoses he had previously used. After receiving a letter from cross-complainants' attorney in August 1978, George stopped draining the swimming pool water onto lot 115.

When Mr. George received the letter in 1980 informing him that cross-complainants had caused a survey to be done, he thought that they were

"pulling [his] leg," and that the survey was erroneous, because no engineer was responsible for the map that accompanied cross-complainants' letter. Wilfred Astvasadoorian, a friend of Mr. George employed as a licensed civil engineer by the Fresno County Department of Public Works, examined the map prepared by cross-complainants' surveyor and found three discrepancies between that map and the recorded subdivision map for Sierra Sky Park. Mr. Astvasadoorian stated that the survey done at the request of cross-complainants had erroneously established the boundary between lot 62 and lot 115 to the southward of its actual location, but he could not tell how much southward. He also felt that the survey map prepared by cross-complainants' surveyor was improper because no section corner had been located and because the engineer responsible had not signed the map. Mr. George did not have his own survey done of the boundary between his lot and lot 115 because he felt it would have been a waste of money.

Mr. George did not seek permission to place sod on the bluffs just north of his property because he knew that everyone else who lived in the area took similar actions to prevent erosion of the bluff near their properties without first obtaining permission of the owner of lot 115. The Beighleys and the Meccas placed vegetation on the bluff portion of lot 115 without seeking permission prior to the time they bought that lot, and the Meccas installed a concrete stairway to the bottom of the bluff without seeking the then owner's permission. Other owners of lots adjacent to lot 115 also made similar nonpermissive encroachments. However, cross-complainants signed quitclaim deeds to the then owner of lot 115 with regard to their encroachments because his title company would not otherwise give him clear title.

Mr. George denied having ever claimed that he had the right to use lot 115 all the way to the bottom of the bluff. He also denied ever having removed or moved any surveying monument.

C. *The Verdicts\**

. . . . . . . . . . . . . . . . . . . . . . .

III. Did Cross-defendants Have a Right to Drain Swimming Pool Water Onto Cross-complainants' Property?

██ Cross-defendants assert that because the County of Fresno possessed an easement over lot 115 for the drainage and disposal of water, they, "[a]s taxpayers, property owners in the same subdivision, and as owners of prop-

---

*See footnote, *ante,* page 1214.

erty sharing common boundary lines with the servient tenement . . . [had] legally recognized rights to use [l]ot 115 for drainage of water."

Only a mind unburdened by the ephemeral shackles of legal training and gloriously free of the stultifying pomposities of precedent and stare decisis could have formulated the epiphanous principle that what the public may do as an entity, so may individual members of the public do, acting in their individual capacities. Appellate counsel for cross-complainants, with an imagination dulled by years of legal training, evidently lacked the audacity to appreciate cross-defendants' argument and misinterpreted (and diminished) it as a mundane attack upon the sufficiency of evidence to support the jury's finding of trespass. Not so. Cross-defendant Mr. George is on the wave front of the expanding legal universe, Prometheus unbound by the strictures of logic and reason that constrain lawyers and judges in their quotidian professional functions.

There is just one problem. The easement is for storm drain water, not mosquito infested swimming pool effluent.

Putting that detail aside, cross-defendants assert in the present case a right to utilize an easement in favor of Fresno County as if the easement were their own. To do so they must commit what is (absent consideration of the county easement) undisputably a trespass on the lands of cross-complainants. Cross-defendants might just as well assert to themselves the county's power of eminent domain, and condemn a portion of cross-complainants' land for their own use, eliminating the entire controversy in the present case except for the value of the land so condemned. (In fact, this is apparently what cross-defendant Mr. George had in mind in his letter of April 25, 1980.) In any event, " '[t]he State acting through an agency thereof is readily distinguished from any particular member of the general public,' " (*State* v. *Jordan* (1972) 53 Hawaii 634 [500 P.2d 560, 563], quoting from *Hurley* v. *Hinckley* (D.Mass. 1969) 304 F.Supp. 704, 709, affirmed, 396 U.S. 277 [24 L.Ed.2d 469, 90 S.Ct. 603]) and therefore it would not be just to excuse what was otherwise a trespass based upon an easement owned by the County of Fresno.[2]

### IV. Did the Trial Court Err in Admitting Cross-Complainants' Exhibit No. 2, a Survey Map?*

. . . . . . . . . . . . . . . . . . . . . . .

---

[2]Cross-defendants' reference to Streets and Highways Code section 8306, which deals with the vacation of public street, highway and service easements, is totally inapposite to the present discussion.

*See footnote, *ante,* page 1214.

## IX. Was the Award of Punitive Damages Proper?

### A. *Propriety of Punitive Damages in Trespass Cases*

██ Cross-defendant Leon George argues that punitive damages were improperly awarded as a matter of law because his conduct was no different than the conduct of other landowners in the neighborhood who also installed permanent improvements and vegetation on lot 115 without seeking the permission of the owners; cross-complainants also performed the same non-permissive encroachments prior to the time they became owners of lot 115. He also claims that a judgment rendered as to the second cross-complaint filed in connection with trial of the original complaint established that punitive damages are not appropriate under the present circumstances.

Punitive damages are authorized under the facts of this appeal by Civil Code section 3294, subdivision (a), which states: "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." Subdivision (c)(1) of Civil Code section 3294 defines "malice" as: "conduct which is intended by the defendant to cause injury to the plaintiff or conduct which is carried on by the defendant with a conscious disregard of the rights or safety of others." ██ The person against whom an award of punitive damages is made must have acted " 'with the intent to vex, injure, or annoy, or with a conscious disregard of the [aggrieved person's] rights. . . .' [Citation.]" (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 922 [148 Cal.Rptr. 389, 582 P.2d 980].) ██ In determining whether an award of punitive damages was proper, the whole record must be examined in a light most favorable to the judgment. (*Ibid.*)

██ It is perhaps understandable that cross-defendant feels singled out when the underlying tort to which the punitive damages apply was in fact committed by many others and by his opponents in this litigation. Cross-complainants argue, however, that it is the manner in which cross-defendant committed his tort that demonstrates the malice which justifies imposition of exemplary damages. Viewed most favorably toward the judgment, the evidence below established that cross-defendant persisted with his siphoning of swimming pool water long after being told by cross-complainants and by a sheriff's deputy to desist, and attempted to conceal his continued siphoning,[11] he permitted permanent improvements to be constructed so as to en-

---

[11]Cross-defendant's assertion in his reply brief that he was merely attempting to protect his hoses from destruction when he placed the brush over them is totally unsupported in the record and would merely create a conflict in the evidence which this court would have to presume was resolved against him.

croach upon cross-complainants' land after being warned that they would so encroach, and after being advised that a survey had established that his structures encroached, he refused to move them. In addition, and most inculpating, cross-defendant repeatedly asserted that he was entitled to do as he wished with cross-complainants' land, disparaging cross-complainants' interests and at one point destroying a survey monument while declaring that such indices of property rights meant nothing to him. Under these circumstances, Mr. George manifested an unmistakably conscious disregard for the property rights of cross-complainants, and thus could reasonably be said to have acted with malice.[12] ■ "Where a trespass is committed from wanton or malicious motives, or a reckless disregard of the rights of others, or under circumstances of great hardship or oppression, it is clear that punitive damages may be awarded." (*Haun* v. *Hyman* (1963) 223 Cal.App.2d 615, 620 [36 Cal.Rptr. 84].)[13]

■ Cross-defendant's claim that the judgment rendered as to the second cross-complaint established that punitive damages are inappropriate is, like most of his arguments, procedurally improper and factually inaccurate. Assuming that the copy of the transcript of an "oral tentative decision" appended to cross-defendants' reply brief may be treated as a request that this court take judicial notice of the relevant judgment, this court may not act upon such a request until a certified copy of the subject document is provided. (*People* v. *Preslie* (1977) 70 Cal.App.3d 486, 494-495 [138 Cal.Rptr. 828].)

In addition, the decision attached to the reply brief was addressed to trespasses and encroachments occurring after the trial involved in the present appeal, and the trial court in the later proceedings was obviously swayed in his decision regarding punitive damages by the earlier judgment: "I have given some consideration to punitive damages, and I'll tell you, Mr. George, the thing that most persuades me to think that punitive damages may be appropriate in this case is your repeated letters to Mr. Carruth saying 'Draw the line, draw the line.' . . . [¶] However, looking at the— the evidence with respect to punitive damages—punitive damages *since the*

---

[12]Cross-defendants' citation to *Maheu* v. *Hughes Tool Co.* (9th Cir. 1977) 569 F.2d 459 for the principle that "[t]he conduct of any individual is not independent of the surrounding circumstances, and the behavior of other members of the same community is relevant" to the punitive damage analysis is baffling: nothing even remotely supporting the cited rule appears in that opinion.

[13]Cross-defendant claims that an award of punitive damages in the present case is violative of "public policy," citing *Zhadan* v. *Downtown L. A. Motors* (1976) 66 Cal.App.3d 481, 497 [136 Cal.Rptr. 132]. Since that case stated that consideration of the public policy violated by the tortfeasor and the magnitude of such violation was an element affecting review of the *amount* of punitive damages, it will be discussed below.

*last trial,* I am persuaded that punitive damages are not appropriate and none are awarded.'' (Italics added.)

 For the above reasons, it must be concluded that punitive damages were properly awardable.

### B. *Amount of Punitive Damages*

 Cross-defendant contends that the amount of punitive damages awarded in the present case ($15,000) was excessive, because (1) the amount of actual damage suffered was small, (2) the ratio of punitive to compensatory damages was high, (3) the amount of punitive damages awarded equaled or exceeded his net worth, and (4) no adequate guidance was given to the jury governing the awarding of punitive damages.[14]

The cases dealing with issues of the asserted excessiveness of punitive damages are legion; not surprisingly, since every tortfeasor must feel that his conduct was not nearly reprehensible enough to justify any such damages, let alone a large and significant amount. The latest authoritative pronouncement from the Supreme Court supplies the relevant general principles: ''[R]eview of punitive damage awards rendered at the trial level is guided by the 'historically honored standard of reversing as excessive only those judgments which the entire record, when viewed most favorably to the judgment, indicates were rendered as the result of passion and prejudice. . . .' [Citation.] Stating the matter somewhat differently . . . an appellate court may reverse such an award 'only '' '[w]hen the award as a matter of law appears excessive, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice.' '' ' [Citation.]

 ''In making the indicated assessment we are afforded guidance by certain established principles, all of which are grounded in the purpose and function of punitive damages. One factor is the particular nature of the defendant's acts in light of the whole record; clearly, different acts may be of varying degrees of reprehensibility, and the more reprehensible the act, the greater the appropriate punishment, assuming all other factors are equal. [Citations.] Another relevant yardstick is the amount of compensatory damages awarded; in general, even an act of considerable reprehensibility will not be seen to justify a proportionally high amount of punitive damages if

---

[14]Cross-defendant's contention that the jury was given inadequate guidance as to the amount of punitive damages to be awarded is without merit. The jury was accurately instructed on that issue according to the principles enunciated in *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, as exemplified in California Jury Instructions, Civil (6th rev. ed. 1983 pocket pt.) BAJI No. 14.71 (1981 rev.).

the actual harm suffered thereby is small. [Citation.] Also to be considered is the wealth of the particular defendant; obviously, the function of deterrence . . . will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort. [Citations.] By the same token, of course, the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter." (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 927-928, fn. omitted.)

A very perceptive discussion of the nature of appellate review of a punitive damage award is found in the recent case of *Devlin* v. *Kearny Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381 [202 Cal.Rptr. 204], in which the Court of Appeal stated: "The process through which a factfinder finds punitive damages is somewhat contradictory. On the one hand, the court or jury must be sufficiently disturbed to conclude the defendant must be punished. On the other hand, although outraged, the factfinder cannot be vindictive. The channeling of just the correct quantum of bile to reach the correct level of punitive damages is, to put it mildly, an unscientific process complicated by personality differences. Conduct which one person may view as outrageous another may accept without feeling, depending on such diverse characteristics as an individual's background, temperament and societal concerns. The process is further complicated by the lack of objective criteria from either the Legislature or the courts as to 'how much' is necessary to punish and deter." (At p. 388.)

Reversing the order of consideration of the *Neal* factors, with regard to the wealth of cross-defendant George, he testified that his residence in Sierra Sky Park had a "normal market" value of more than $250,000, that he owned 10 acres of land worth $50,000, 1 acre of land which he purchased for $30,000, and another house worth $50,000 to $60,000. Mr. George further testified that he had liens outstanding on the above mentioned properties totaling about $250,000, and that if he had to sell his properties "on [the] auction block," the proceeds might not exceed the amount of the liens. When asked if he had other, personal property assets, Mr. George gave an equivocal answer.[15]

On the above evidence, the jury might reasonably have concluded that Mr. George's total worth was about $390,000, with liens of about $250,000

---

[15]"Q [cross-complainants' counsel:] Do you have any other assets? How much do you think you're worth? Do you think you're worth over a half a million dollars?

"A [Mr. George:] It depends on, uh—on whether, uh, it's, uh—whether you dispose my property in the regular time or you dispose of them in irregular time. Because the fact that they are tied up in mostly all my—all what I—what I have basically is tied up in property that you don't know."

outstanding, leaving a net worth of about $140,000.[16] Thus, the punitive damage award was approximately 10.7 percent of cross-defendant's net assets.

Attached as an appendix to the *Devlin* v. *Kearny Mesa AMC/Jeep/Renault, Inc.* opinion is a table sampling various cases in which punitive damages had been awarded in the context of tort litigation against a business defendant. (See *Devlin, supra,* 155 Cal.App.3d at pp. 388, fn. 5, 393-396.) An examination of the cases collected therein reveals that with one exception, punitive damage awards *exceeding* 10 percent of a defendant's net worth have generally been disfavored by the appellate courts. In *Schomer* v. *Smidt* (1980) 113 Cal.App.3d 828 [170 Cal.Rptr. 662], a punitive damage award of $16,000 (compensatory damages were $20,000) which represented 10 percent of the airline employee defendant's net worth (his salary was $62,000 per year) was approved. (*Id.,* at pp. 831, 836-837.) The defendant had intentionally spread false rumors that the plaintiff, a flight attendant, was a lesbian and had engaged in homosexual activities with other flight attendants, all because she (plaintiff) would not socialize with him (defendant). (*Id.,* at pp. 831-832.) In a brief discussion of the punitive damage award, the Court of Appeal held that it "was not shocking to the conscience." (*Id.,* at pp. 836-837.)

It is difficult to derive any articulable rule from the decisional law regarding percentage of net worth figures vis-à-vis punitive damage awards. We can think of no reason why losing 10 percent of net worth would be more or less tolerable to an individual rather than to a business, and the figure 10 percent does not appear particularly shocking; rather it seems a reasonable compromise between punishment and leniency. (See *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 928.) ■ Where the other factors do not militate in favor of reversal, the mere fact that the punitive damages awarded equaled about 10 percent of the tortfeasor's net worth should not itself call for reversal of the damages as excessive.

■ An examination of the cases collected in the appendix to the *Devlin* opinion reveals that the ratios of punitive to compensatory damages therein

---

[16]Cross-defendant contends in his reply brief that his gross assets total $320,000 with liens of $274,000, citing a declaration he filed in connection with his motion for a new trial. He cites no authority which would permit this court to assess the jury's verdict in light of information they never considered, and which was not received in evidence at trial. Similarly, Mr. George's repeated insistence that his properties would not sell for full value if disposed of in forced sale or auction, while possibly true, has no discernible relevance to the calculus of his net worth.

Note also that the present appeal is not a situation where no evidence of net worth was available to the trier of fact, as in *Vossler* v. *Richards Manufacturing Co.* (1983) 143 Cal.App.3d 952, 961-965 [192 Cal.Rptr. 219].

range from 0.8:1 to 2,000:1, demonstrating that the present award, involving a ratio of approximately 21:1, is not grossly disproportionate when compared to what other appellate courts have approved. *Devlin* itself approved an award of punitive damages ($80,000) 27 times the compensatory damages ($3,000), under circumstances where an elderly couple had been defrauded in the purchase of an automobile. (See *Devlin* v. *Kearny Mesa AMC/Jeep/Renault, Inc., supra,* 155 Cal.App.3d at pp. 384, 390.) This court recently approved a punitive to compensatory ratio of 20:1 ($500,000 to $25,000) in *Vossler* v. *Richards Manufacturing Co., supra,* 143 Cal.App.3d 952, 968-969. In *Weisenburg* v. *Molina* (1976) 58 Cal.App.3d 478 [129 Cal.Rptr. 813], a case involving abuse of process to defraud a judgment creditor, the Court of Appeal affirmed an award of $25,000 in connection with $625.40 in compensatory damages. (*Id.,* at pp. 482, 490-491.) Thus, the relationship between the punitive and compensatory damages in the present case does not appear to warrant a reversal of the punitive damage award.

Finally, and perhaps most importantly, the degree of reprehensibility of the tortfeasor's conduct must be considered. Cross-complainants' brief on appeal is silent with regard to this element of the *Neal* analysis, and understandably so, for viewed in the perspective of the wrongs and injuries usually justifying punitive damages, the acts committed by cross-defendant George in the present case can at most be characterized as annoyances. The right to own and use private property without interference from others is an important public policy, but George's violation of that policy might, in circumstances involving less hostility, be reasonably judged de minimis. (See *Zhadan* v. *Downtown L. A. Motors, supra,* 66 Cal.App.3d 481, 497.)

The most troubling aspect of the present appeal is that none of the squabbling neighbors herein can be said to have the equities on his or her side. Cross-complainants undisputedly tried to force the Georges to add a plane port to their residence by withholding access to electrical power across their land; a right Mr. George subsequently vindicated. When he resisted, using the mechanism society provides for conflict resolution—the courts—they attempted to destroy his career by making unfounded reports to his employer and other public officials that he was pursuing private business during working hours. Finally, cross-complainants proceeded to seek damages against George for some encroachments and trespasses similar to those they had themselves engaged in before they became the owners of lot 115.

However, it must be recognized that Mr. George acted with absolute defiance. He claimed a right to encroach and trespass upon cross-complainants' property. He figuratively shook a clenched fist at his neighbors and displayed a complete disregard for their rights. He forced them to come

into court to assert those rights and spent seven trial days on an indefensible case.

It seems almost certain that Mr. George's conduct during trial (he appeared in pro. per.) convinced the jury that his combativeness and abrasiveness were responsible for the controversies between the parties and enhanced the jury's perception of the reprehensibility of his undeniable torts. Speaking in his broken English, browbeating witnesses, attempting to argue his case during presentation of evidence and constantly violating rules of procedure and evidence, the jury could hardly have found him a sympathetic party during trial.

It may thus be reasonably said that the jury's punitive damage verdict was at least in part reflective of the jury's annoyance with Mr. George's conduct in court, as distinguished from his conduct in reference to lot 115. To that extent, it was a result of passion and prejudice and was not based on those acts for which he should be punished. Although all presumptions favor the correctness of the verdict and judgment (*Finney* v. *Lockhart* (1950) 35 Cal.2d 161, 164 [217 P.2d 19]), and while the trial court's determination on the motion for new trial must be accorded great weight (*Moore* v. *American United Life Ins. Co.* (1984) 150 Cal.App.3d 610, 642 [197 Cal.Rptr. 878]), we conclude that reviewing the entire record most favorably to the judgment indicates the award was rendered as a result of passion and prejudice.

Mr. George's actions, although reprehensible, do not approach the derelictions of those defendants whose wrongdoings are chronicled in the punitive damages cases. (See, for example, *Devlin* v. *Kearny Mesa AMC/Jeep/ Renault, Inc., supra,* 155 Cal.App.3d 381; *Schomer* v. *Smidt* (1980) 113 Cal.App.3d 828 [170 Cal.Rptr. 662]; *Vossler* v. *Richards Manufacturing Co., supra,* 143 Cal.App.3d 952; *Grimshaw* v. *Ford Motor Co.* (1981) 119 Cal.App.3d 757 [174 Cal.Rptr. 348].) While Mr. George's behavior cannot be excused by the incivility of his neighbors, such is a factor to consider in determining the extent that the law should punish him.

## X. Conclusion

The judgment is affirmed except that the punitive damage award herein is vacated and the matter remanded for a new trial on that issue only, provided that if cross-complainants shall, within 30 days from the date of our remittitur, file with the clerk of this court and serve upon cross-defendant Leon Y. George a written consent to a reduction of the punitive damage award to the sum of $7,500, the judgment will be modified to award cross-com-

plainants punitive damages in that amount, and as so modified, affirmed in its entirety. Each party to bear his or her costs on appeal.

Hanson (P. D.), Acting P. J., and Ardaiz, J.,* concurred.

A petition for a rehearing was denied December 18, 1984, and appellants' petition for a hearing by the Supreme Court was denied January 23, 1985.

.

*Assigned by the Chairperson of the Judicial Council.